STATE *v.* EDWARDS.

---

STATE v. DAVID EDWARDS.

*Manslaughter—Declarations of Prisoner, admissibility of—Evidence—Instructions.*

1. The declarations of a prisoner made immediately after and not during the transaction constituting the offense with which he is charged are not admissible in evidence, except as corroborative of his evidence if he has availed himself of the privilege of testifying in his own behalf.

2. On a trial for murder the defendant cannot complain of the exclusion of his declarations made after the struggle and shooting which resulted in the death of his antagonist, if, in a subsequent period of the trial, all of such declarations were admitted after the State had called out a part of them.

3. On a trial for murder the Solicitor was permitted to ask a female witness (for whose favor the deceased and the prisoner were rivals, and who was sitting in the lap of the deceased just before the fatal struggle) whether the prisoner, when he came towards her and the deceased, appeared to be mad or in fun, the reply being that he seemed to be mad: *Held*, that such question being only a simpler form of an inquiry as to what the manner of defendant was when he approached deceased, was not improperly admitted.

4. On a trial for murder it appeared that the prisoner, the deceased and others were together in a house; defendant went out and declared to a witness that he came near killing the deceased because he had cut him out of his (the prisoner's) girl; on re-entering the house he saw the girl sitting on the lap of the deceased, and after lying for awhile on a bed with a pistol in his hand he arose and approached the deceased and said with an oath, "I am going to kill you"; deceased then pulled his pistol and asked for peace, and the girl having left his lap, he arose and immediately the struggle began between him and the prisoner; by-standers grabbed the pistols of the men, the deceased saying he was willing to give up his—defendant refusing to surrender his; the men were then released and began pushing each other; defendant's foot went through the floor and his pistol was discharged; deceased then shot at but missed defendant, who thereupon fired again, fatally wounding the deceased, who again fired at but missed the defendant: *Held*, that the declarations of the defendant when he went out of the house and all his actions upon his return evinced a deadly purpose, and the evidence showed no such change of purpose and effort by him to avoid a conflict, and no notice to deceased of such change after he had declared his purpose to kill the deceased, as would warrant the jury in finding that the killing was done in self-defence, and the Court properly refused to instruct the jury that defendant was not guilty if his pistol went off by accident the first time and deceased began to shoot at him and defendant shot to save his own life or to escape great bodily harm.

The defendant was indicted for the murder of DeWitt Lovin and tried before *Bynum, J.*, and a jury, at Fall Term, 1892, of the Superior Court of SWAIN County.

On the trial Louisa Justice, a witness for the State, after testifying that she saw defendant and prisoner at a neighbor's house where they were "deviling and drawing their

pistols on each other and saying they were going to shoot one another," said: "Next saw them at Holder's; I went home; defendant and Lovin went with me; they would grab one another, deviling one another, and pull out their pistols; we told them to put them up and they did; defendant was laughing and going on with his devilment; defendant came in the house and sat down on the bed; I began peeling potatoes; Edwards began peeling them and made like he was going to throw them at me; he took out his pistol; we told him to put it up; he laid it on the shelf; Lovin and me reached to push it further on the shelf; defendant saw us and reached and got it and put it in his pocket; we told them again to put up their pistols; Lovin broke his pistol and dropped the cartridges in my sister's lap; defendant would not do it; don't remember his language; he stuck his pistol in his pocket and my sister handed the cartridges back to Lovin; he said they had four a-piece; Lovin put two of them in his pistol and put it in his pocket; after this defendant got on his all-fours and shot in the clothes-press; he said he was shooting at a little diamond; he got up and came to the fire-place; got his hat and stuck his knife through it in the floor and told Lovin to step back and shoot at it; Lovin said he would not; my husband said he would have no more shooting, and picked up the knife and put it in his pocket, and he and my brother Billy took Edwards out of the door; I got supper and called them to come in; Edwards laid on the bed; Lovin was sitting before the fire and my sister was sitting in his lap; we begged defendant to come to supper; he said he was sick and could not eat; Lovin would not eat either; defendant had his pistol in his hand when he came in the house and lay down on the bed with it in his hand, and came up before where Lovin was sitting with my sister in his lap and said, 'Lovin, God damn you, I am going to kill you'; Lovin said, 'No, I reckon not, surely;

let's have no fuss at all'; Lovin went to raise up, my sister threw his hands off so as to get out of his lap, and I grabbed her and threw her across the fire-place; by that time defendant said, 'Damn you, Lovin, you have got to die'; Lovin was begging for peace; they rose up, were wound up together; when defendant told Lovin he had to die he jerked his pistol out and dropped his hand by his side; my husband grabbed defendant's pistol; brother Billy grabbed Lovin's and begged them to give up their pistols; Lovin said he would give his up; defendant said he would not do it; Justice and Billy let loose the pistols and turned around and stepped back a step; defendant and Lovin began shoving each other again; defendant fell through the floor with his left foot and his pistol went off, etc.; then Lovin shot at him; defendant jerked his hand back and the ball went in the logs; then defendant shot Lovin in the stomach; Lovin started backwards and defendant shot again—ball passed over my shoulder; Lovin stepped back and shot at defendant again; defendant went to the bed squatted down and pointed his pistol towards the door at my breast; Lovin went out of the door and fell flat on his back and said, 'I am dead'; defendant told me to shut the door or he would kill the first man that came in the house; I shut the door; Lovin was shot Saturday night about 10 o'clock and died the following Monday about 12:15; defendant called my sister his Georgia gal; I and my sister washed Lovin's clothes; they were bloody and black—three holes shot through his shirt; just as defendant's left foot went through the floor he shot; defendant asked me after the shooting what I would swear; I told him I would swear the truth; he drew his pistol on me; my husband told him not to do that; he stepped back and said, 'Brother, I ain't' going to hurt her.'" Upon cross-examination witness stated that "when Lovin got up from his chair he was near the wall; Edwards walked

around and when Lovin turned they were near together and facing each other, when they clinched; as the defendant stepped through the floor his left hand went down, his right hand went up and his pistol fired; Lovin then fired immediately; after this I saw the defendant's pistol fire—the light right at Lovin's stomach; he fired this shot just as he jerked his foot out of the floor; then Lovin fired his second shot; the shots were almost together—could hardly tell one from the other; Edwards said he had shot Lovin; while defendant was squatted down by the bed Lovin was snapping his pistol at him." Defendant's counsel proposed to ask the witness what Lovin said to her about the shooting, and in reply to question by Solicitor witness stated that what defendant said to her was about a minute after he had shot Lovin and after Lovin had fallen out of the door and she had shut the door, having been told by the defendant to shut it. Solicitor objected. Defendant insisted it was competent as a part of the *res gestae*. The objection was sustained. (This declaration was subsequently admitted from another witness, the State having called for a part of them). "After Lovin shot he went backward a little, and out of the door; defendant was then behind the bed; after Lovin got out of the door I heard the pistol snapping; that is the time of conversation with the defendant, when I told defendant I would swear the truth; he said that was right." The prisoner proposed to ask witness if a little after the shooting defendant did not say he wanted them to send for a physician, and that he had the money to pay for it. This was offered to rebut malice. Objection sustained. Proposition to ask witness if defendant did not tell her, after Lovin was shot and after he was out of the door and before defendant had seen Lovin, that the first shot was an accident. Objection sustained. The witness then proceeded, and stated that defendant and

Lovin both were pretty drunk; when defendant got off of the bed he had his pistol by his side; it was a self-acting pistol; witness did not notice the lock.

James Justice, introduced for the State, testified substantially the same as above, except that he said the defendant and Lovin were at his house when he got home, and that defendant lay down on the bed and it broke through with him, and he asked Lovin to help him fix it up, which he did; they sat and talked awhile; Lovin went and sat down near the fire and pulled Theresa (witness's wife's sister) down in his lap. She tried to get loose. Defendant was then still on the bed. He sat there a minute; got up, whispered to Billy Garrett (witness' wife's brother) and they went out the door. "In five or ten minutes I went out to where they (defendant and Billy) were sitting. Heard defendant bring out an oath. Said 'I came damn near killing DeWitt in there awhile ago.' Don't know whether I asked him why or not, but he said 'I told him to-day as we were coming along that if he cut me out of my Georgia gal I would kill him, and you see how he is doing, don't you?' I told him not to do it, as it would make him feel awful to kill a man. He said he knew the feeling, had shot a man in the eleventh rib, and supposed he was in hell; that he had killed another man and killed his wife. He asked me and Billy to go in the house and arrest Lovin and have some fun. We told him no. My wife asked us in to supper. Defendant said he liked Theresa mighty well, and Loving was cutting him out. Theresa was sitting in Lovin's lap before defendant went out and was sitting in his lap when defendant came back in the house. Before this she had been sitting on the bed talking to defendant a minute or two and then left him. When we went in the house defendant went to the bed and lay down. When defendant told Lovin he had to die he drew his pistol by his side and stepped a step

or two, laid his hand on defendant and said let's have peace and none of this. 'Ed., I will give up my pistol if you will, and we will pass it off as fun.' I went and took hold of Edwards' pistol and he said no, he'd be God damn if I got it. Billy caught hold of Lovin as I took hold of Edwards. I then turned defendant loose, stepped a step from them and turned my head. Heard a fuss, turned my head and saw defendant's pistol in his hand go off. Light of it went over Lovin's shoulder. Lovin dodged his head and jobbed his pistol in defendant's breast. Defendant knocked it off and it shot in the side of the house. Then defendant presented his pistol at Lovin's breast, Lovin knocked it down and it shot him in the stomach. Lovin stepped back towards the door two or three steps and shot at defendant again. Defendant shot again and it went over my wife's head to right of the door. Lovin stepped outdoors and fell. Defendant squatted by side of the bed, presented his pistol. Lovin fell, said he was dead. I stepped to him, asked him where he was shot, and he pulled up his shirt and showed me. It was about one and a half inches above the navel and to left side. It was not over a minute after I turned Edwards' pistol loose until first shot fired. Billy Garrett is eighteen; Theresa Garrett sixteen years old. After the shooting defendant tried to get us to save him. Told him I would swear the truth. Upon cross-examination witness stated that Edwards tried to get us to swear Lovin fired the first shot. Defendant said the first shot was an accident, that he did not intend to shoot at Lovin; said he shot Lovin in self-defence; said he had fifty dollars, to send for doctor. Seemed to regret it very much after the shooting. Defendant got off the bed and came to Lovin and they got in the scuffle. I thought we had talked them out of it, and turned around; heard a noise; defendant had his pistol

right in Lovin's face; it fired." Rest of this witness's testimony substantially same as his wife's.

Theresa Garrett, witness for State, testified substantially the same as her sister, Louisa Justice, except that on cross-examination she said " Lovin and defendant had a quart bottle nearly full of liquor when they came to my sister's, and it was all drunk up when the shooting took place."

On her re-direct examination the Solicitor proposed to ask her if the last time Edwards came up to Lovin, when witness was sitting in Lovin's lap, Edwards appeared to be mad or appeared to be in fun. Objection; overruled; exception. Witness answered that he appeared to be mad. Witness was further allowed to testify, under the objection of the defendant, on the re-direct examination, as follows: "Right smart little after the shooting the defendant kissed his pistol on the side and said it was his pet, and that it was the third man he had shot; that he had killed his wife and two children." Being again cross-examined, she said that Justice and his wife and Billy Garrett were present at this conversation.

Billy Garrett, witness for the State, testified substantially to the same facts as Louisa and James Justice, except that when defendant shot Lovin he aimed at his breast, and Lovin knocked it down and it hit him in the stomach; defendant said afterwards he aimed to hit him about the left suspender buckle. And further, on cross-examination, when Justice and the witness turned him loose they did not agree to stop; they did not say they would or they would not; witness thought it was stopped. And further testified, on cross-examination: " Right smart while after the shooting the defendant said he would give fifty dollars for a doctor; 'poor fellow, I hate it; I shot him in self-defence.'"

Defendant's counsel asked the Court, in writing, to instruct the jury as follows: " That if the jury shall find

from the testimony that the prisoner and the deceased had stopped the first difficulty, and that after the witnesses James Justice and William Garrett turned around to go to their supper, and one minute or one and a half minutes later the prisoner's foot fell through the floor and his pistol went off by accident and that the deceased then began to shoot at the prisoner and the prisoner shot to save his life or great bodily harm, that the prisoner would not be guilty."

This instruction was refused by the Court, except as it is contained in the charge as given. (The charge of the Court is not material to an understanding of the opinion).

There was a verdict of not guilty of murder, but guilty of the felonious slaying of DeWitt Lovin; and the prisoner appealed from the judgment rendered.

*The Attorney General,* for the State.
*Messrs. W. H. Malone* and *J. W. Cooper,* for defendant.

MACRAE, J.: The first exception was to the refusal of his Honor to permit the declarations of the prisoner, made after the deceased had been shot and had gone out of the house and the door was shut, to be given in evidence. Unless the declarations form a part of the transaction they are not receivable in evidence. What the prisoner might have said during the struggle, or while giving the blow, or firing the pistol, is competent to be considered as explanatory of the act; but it is too late after the fact has been accomplished to make the explanation. *State* v. *Tilly,* 3 Ired., 424; *State* v. *Hildreth,* 9 Ired., 440; *State* v. *Brandon,* 8 Jones, 463.

It is true that such declarations are now competent by way of corroboration of the prisoner's evidence if he has availed himself of the right to testify as a witness in his

own behalf, but in any other view the law is unchanged. It seems in this case that the State having at a later period of the trial offered some of the declarations of the prisoner, as a matter of course all of them made at the same time were given in evidence. The prisoner, then, has had the full benefit of the evidence which was at first excluded but afterwards admitted. This will apply also to the second exception, for refusal of his Honor to permit the State's witness Louisa Justice to be asked upon the cross-examination, "If a little after the shooting defendant did not say he wanted them to send for a physician and he had the money to pay for it," by which counsel proposed to rebut a presumption of malice arising from the killing with a deadly weapon. But we do not mean to intimate that such declarations, made after the act, would have been competent for the purpose indicated.

The Solicitor was permitted to ask the witness Theresa Garrett if the last time Edwards came up to Lovin, when witness was sitting in Lovin's lap, Edwards appeared to be mad or appeared to be in fun; the reply to which question was that he appeared to be mad. We can see no merit in this exception. If the question had been what was the manner of the prisoner when he approached deceased, there would probably have been no objection. We presume that the question was put in a simpler form to reach the comprehension of the witness.

There was also an objection to the testimony of this witness as to the remark of the prisoner, "Right smart little after the shooting," which probably means a short time thereafter; that he kissed his pistol and said it was his pet, and it was the third man he had shot, and that he had killed his wife and two children. But no exception was taken to the admission of this testimony.

The prayer for special instructions offered by the prisoner's counsel was neither warranted by the testimony nor by the law. We can conceive of no view of this case in the light of the evidence in which the homicide would have been excusable. Taking all the testimony, the prisoner was the aggressor and the deceased gave no provocation, but rather sought to avoid the conflict.

While the prisoner and deceased had been rough in their actions towards each other, both of them unhappily being under the influence of spirituous liquors, there is no evidence of any bad blood between them until the prisoner seemed to take offense at the familiarity of deceased with the young woman. The declarations of the prisoner to William Garrett, when they went out together, and all of his acts upon his return into the house up to the moment of the final catastrophe, went far to evince a deadly purpose. The acts of the deceased showed a disposition from the first to avoid any difficulty. We think his Honor exercised all the humanity of the law when he presented the case to the jury in such a light as to enable them to reduce the grade of the crime from murder to manslaughter.

The careless or reckless handling of the pistol by the prisoner, if, under the circumstances detailed, it had gone off by accident and killed deceased, would have taken away all excuse, and if it had not shown "a heart so fatally bent on mischief" as to supply malice, was at any event such gross carelessness as to have made the killing felonious, though wanting in express malice.

Under the circumstances as detailed by the witnesses there was no retreating, no evident change of purpose and effort to avoid a conflict and notice to deceased of such change after the prisoner had approached deceased and expressed his intention to kill him, as would enable the

jury in any view of the case to have reached the conclusion that the killing was done in self-defence.

There were no exceptions to the charge as given, as there could not have been on the part of the prisoner with the least show of merit.

We conclude, upon examination of the record and the case, that there is no ground for the motion in arrest of judgment, nothing having been suggested to us to that effect, and that perhaps it is fortunate for the prisoner that this Court finds no error of which he can complain, and that he is not to be put on his trial again.

. No Error.                                    Affirmed.