The defendant was prosecuted for the murder of Lillie Kincaid, his wife, and from judgment pronounced on a verdict for murder in the second degree, he appealed.
The defendant's residence, which was in Chesterfield, five or six miles from Morganton, was occupied by the defendant, his (711) wife, her mother, and the defendant's brother, whose mental condition was abnormal. The defendant conducted a mercantile business about two hundred and fifty yards from his residence. He and the deceased had been married about fifteen years. Her death occurred late on Monday, 18 July, 1921. On Sunday the defendant began to drink liquor, and on Monday he drank more freely until noon, when he began to take a drink every few minutes, and about 6 o'clock drank a pint; he then made a trip in a car to John's River, about two miles from home, and returned to his store between sunset and dark, whereupon he and Rader each took a drink, and the defendant, after a short interval, took the last drink before going home.
The deceased spent Monday in the store; she was there when the defendant returned from John's Creek; and after the defendant and Rader had taken a drink, the deceased called to the defendant, "Come on and let's go." The deceased went home alone, and the defendant tried to crank his car, but "it wouldn't fire." The deceased, after going home, told her mother that the defendant could not make the car go — "he's *Page 760 
too drunk, he can't bring that car to the house." The deceased and her mother ate supper, and the deceased went twice to the store and returned each time alone, the last time about 9 o'clock.
The residence, not including the kitchen, was a two-story building with an ell on the east side; alongside the kitchen was a five-foot porch, from which a door opens into the hall of the main building; on this porch was a shelf about five feet long, and east of the porch and kitchen were the well-house and the pump. A few hours before the death of the deceased, her mother had left on the shelf referred to a knife which she had used in the preparation of vegetables. After a while the defendant came from the store to the porch at the rear of the house; the deceased went through the hall to the porch, and her mother went into her room to light a lamp; just as the light was struck, the mother of the deceased heard the defendant in a loud voice say, "Lillie, damn it, I won't take that," and afterward heard "a choking, gurgling noise"; running to the back door, she found the defendant and the deceased standing at the end of the porch; the defendant had his hands around the neck of the deceased, who was "up against the wall." The mother asked the defendant why he was choking the deceased, and he answered: "Mrs. Davis, you don't understand"; she then released his hand and exclaimed, "Lillie, Sidney has killed you," and in a hoarse voice the deceased responded, "No, he hasn't." Mrs. Davis went into the house for a lamp, and upon returning found the deceased and the defendant sinking to the floor, blood gurgling from the wound; the defendant held the deceased in his arms, kissing her as they gradually went to the (712) floor, after they had fallen, "screamed all he could scream," and said, "Surely I haven't done this."
The following is the defendant's testimony of the occurrence: "I went on home as usual, around the house the back way, the way I usually go, and when I got in the back side, the east side of the house, I met my wife just off the back porch; as I recall, she says, `You're going to keep on until you get on too much.' I put my arm around her neck and said, `Oh, No, I'm all right,' walking in the porch and playing with her with something in my hand, coddling her about the shoulders; next I heard, Mrs. Davis spoke something; I don't recall what that was, it seems kinder like a dream that she said something; I just can't say positively what it was, whether `What have you done?' or `What have you done to Lillie?' or `Have you killed her?' — I can't say just what she did say. I felt something, seemed to realize something had happened. I didn't know what it was, what the trouble was; I saw something lying on the shelf, apparently looked like a knife; I picked it up and threw it out like that (indicating). *Page 761 
"I remember lying down with my wife, seemed I could feel her begin to sink; I had her in my arms and we laid down somewhere there on the porch or in the door, I don't know just where. I didn't know what was said when we went down; I laid down; I don't know what was said or done.
"It is kinder like a dream; I remember seeing a few people there that night, several that I knew, heard their voices, and knew their voices; Dr. Riddle was one, Charlie Rader was one, one of the Conley boys, I don't recall which one now, Mr. Bright, I believe. I recall that somebody said something about the sheriff, and Mr. Bright said, `He's here now, coming now.' Dr. Riddle's name, I recall, was mentioned; I don't know what was said about him. That's about all I recollect of the circumstances."
The next morning the defendant's spectacles were found on the shelf and the knife in the yard near the well.
The physician testified that on the left side of the neck of the deceased there was in incision between an inch and an inch and a quarter in length, and at right angles with the neck; that the appearance indicated a direct stab, and that a large blood vessel had been severed or cut.
There was evidence for the State tending to show that for several years the conduct of the defendant toward the deceased had been offensive and menacing, especially when he was under the influence of liquor; and for the defendant there was evidence tending to show that he had always been considerate and affectionate.
The defendant contended that he did not inflict the wound; that he did not know the knife was on the shelf, and that if he (713) inflicted the wound he did it unintentionally.
After the arraignment, his Honor, on motion of the solicitor, made an order that 75 jurors be summoned from Lincoln County; and to the denial of the request that these jurors be drawn from the box, exception was duly taken.
The statute provides, (1) that the presiding judge, instead of making an order of removal, may cause as many jurors as he deems necessary to be summoned from any adjoining county, or from any county in the same judicial district; and (2) that the judge may direct the required number of names to be drawn from the jury box in said *Page 762 
county. C. S. 473. The obvious purpose is to authorize the court either to cause the jurors to be summoned by the sheriff or to direct that they be drawn from the box. While the adoption of the latter course is commendable, it is not always practicable, and the presiding judge, in the exercise of sound legal discretion, must determine by which of these methods the ends of justice may best be subserved.
On the cross-examination of Dr. Riddle, and on the direct examination of R. V. Michaux, the defendant proposed to show that, judged by the observation of the witnesses, the relation between him and the deceased had been one of love and affection. The proposed evidence was excluded. Thereafter, Dr. Riddle, in response to a question as to any observed fact or circumstance tending to show such relation, testified as follows: "I saw Mr. Kincaid when his wife was sick, and he made efforts to have something done, asked me to operate on her; she was at the hospital for an examination, and he seemed to be very anxious that something be done for her, and as I remember it a day was kinder set to do something for her, but nothing definite. Mr. Kincaid seemed to be anxious that something be done for his wife.
"I didn't see them going about together so often; saw them in town occasionally in a car. Mr. Kincaid brought her to town, the best I remember. I don't remember anything further that throws light on their relation to each other. He was very kind to her in my presence always."
This witness, referring to the defendant, further testified, "I always thought he was very fond of his wife." On motion of the solicitor, this expression was withdrawn from the jury.
R. V. Michaux testified as follows: "I visited at their home. (714) I have seen them in their home and seen them at church, seen them at Marvin camp meeting two or three times, seen them here in Morganton, and in the store lots of times. I never saw them both in their home. I have seen them in the store several times; she was generally in the store when I was in there. At the times I have seen them together they seemed to speak to each other kindly, friendly, and all right when I saw them."
To the withdrawal of Dr. Riddle's conclusion that the defendant had been "very fond of his wife," the defendant first excepted at the time of preparing and serving his case on appeal. The delayed exception cannot avail him, for there is nothing that takes the case out of the general rule that exceptions not entered at the trial will not be considered on appeal. C. S. 590; S. v. Braddy, 104 N.C. 737; S. v. Jones, 69 N.C. 16; S. v.Craige, 89 N.C. 479; S. v. Glisson, 93 N.C. 509.
Not infrequently the opinions of nonexpert witnesses are received in evidence ex necessitate. It is sometimes impossible for a witness to state pertinent facts in such manner as to enable the jury to form a proper *Page 763 
conclusion apart from the opinion of the witness. Indeed, the witness himself may not be able clearly to separate the circumstances from which he has derived his conclusion from the conclusion itself. The ground upon which opinions are admitted in such cases is that, from the very nature of the subject in issue, it cannot be stated or described in such language as will enable persons noe eye-witnesses to form an accurate judgment in regard to it. Jones on Ev., sec. 360. Upon questions of science and skill opinions may be received from persons who are especially instructed by experience, study, and reflection in the particular science, art, or mystery to which the investigation relates; but upon a variety of unscientific questions there is also admissible the opinion of a nonprofessional witness, which is intended, not as a theoretical or scientific opinion, but as the expression of his judgment, based upon personal observation, and so understood at the time it is offered. Comrs.v. George, 182 N.C. 414; S. v. Edwards, 112 N.C. 901; Arrowood v. R. R.,126 N.C. 629; Burney v. Allen, 127 N.C. 477; S. v. Turner, 143 N.C. 642;Taylor v. Security Co., 145 N.C. 389; Ives v. Lumber Co., 147 N.C. 307;Bennett v. Mfg. Co., ibid, 620; Britt v. R. R., 148 N.C. 40; Murdock v. R.R., 159 N.C. 131; Clary v. Clary, 24 N.C. 78.
While his Honor might have admitted the proposed answer of the witnesses, the question presented here is whether its exclusion wrought such prejudice to the defendant as entitles him to a new trial. We recognize the principle, fundamental in our jurisprudence, that the jury ordinarily must determine the weight of the evidence; but whether admitted evidence is substantially equivalent to that which is excluded, although not in ipissimis verbis, and whether in view of all the evidence there has been prejudicial error are questions of law to be decided by the court. At the time the proposed evidence was excluded (715) the defendant was on trial for the capital felony, one essential element of which is premeditation; but he was convicted, not of the capital felony, but of murder in the second degree. It was argued, however, that the proposed evidence was competent, not only on the question of deliberation, but on the question whether the defendant intentionally inflicted the wound, or whether the homicide occurred through misadventure; and that the exclusion of the evidence was prejudicial to the defense. Does not the evidence which was admitted resolve this contention against the defendant? He insists that one of the crucial questions involved the relation that had existed between him and his wife. Had it been a relation of "love, respect, and affection; or of hatred, contempt, and bitterness"? Certainly the language of Dr. Riddle and of Michaux was sufficient to dispel any doubt in the mind of the jury as to whether they had regarded the relation between the defendant and the deceased as that of love, hatred, or indifference. We *Page 764 
cannot hold for reversible error the substitution of the words "kind always," "kindly, friendly, and all right" for the words "love and affection," as descriptive of the defendant's disposition toward the deceased.
What has been said applies also to exceptions fourteen, twenty, and twenty-two. Mrs. Hood and Mrs. Conley minutely told of their association with the defendant and his wife — Mrs. Hood testifying that "each treated the other nice"; and Mrs. Conley that "they always seemed kind to each other." The mere statement by each witness as to the subjective impression produced by the appearance of the defendant and the deceased in the church yard more than two months before the homicide is not ground for a new trial; and the question asked Mrs. Davis was so indefinite as to preclude the necessity of discussing it.
There are several exceptions which relate to the admission of evidence tending to show the defendant's maltreatment of the deceased, or offensive language addressed to her from time to time during a period of several years next preceding the death.
It will be noted that when the evidence was introduced the defendant was prosecuted for the capital felony. In S. v. Rash, 34 N.C. 382,Justice Nash used this language: "Ordinarily the eye of suspicion cannot turn upon the husband as the murderer of his wife; and when charged upon him, in the absence of positive proof, strong and convincing evidence — evidence that leaves no doubt on the mind that he had toward her that mala mens which alone could lead him to perpetrate the crime — is always material. How else could this be done than by showing his acts toward her, the manner in which he treated her, and the declarations of his malignity? . . . In the domestic relation, the malice of one of the parties is rarely to be proved but from a (716) series of acts; and the longer they have existed and the greater the number of them, the more powerful are they to show the state of his feelings. A single expression and a single act of violence are most frequently the result of temporary passion, as evanescent as the cause producing them. But a long continued course of brutal conduct shows a settled state of feeling inimical to the object. We are of opinion, then, that his Honor did not err in receiving the testimony objected to, because malice may be proved as well by previous acts as by previous threats, and often much more satisfactorily. Roscoe's Crim. Ev., 96, 740; 2 Phil. on Ev., 498." S. v. Gailor, 71 N.C. 88; S. v. Wilkins,158 N.C. 603.
The evidence was offered for the purpose of showing intermediate and recurring misconduct of the defendant, and while its weight was to be determined by the jury, the question of its competency was properly decided by the court. S. v. Johnson, 176 N.C. 722. *Page 765 
R. V. Michaux testified that the general character of the prisoner was good, and R. J. Hallyburton and T. N. Hallyburton that it was good as to truth and honesty. On cross-examination Michaux was permitted to testify that he had heard that the defendant had been tried for seduction, but had never heard of his conviction; and each of the Hallyburtons, that the defendant had the general reputation of having been convicted of seduction.
If it be granted that this evidence should have been excluded, we are of opinion that the error was cured by the subsequent admission of the defendant. In S. v. Barrett, 151 N.C. 666, a witness for the State was asked on the direct examination whether he had opposed the defendant's application for membership in a lodge. The witness answered in the affirmative, and assigned as his reason that the defendant had been convicted and imprisoned. Concerning the court's refusal to strike out the impeaching clause in the answer, Justice Brown said: "It was entirely competent for the State to show motive upon the part of the defendant to burn the barn occupied and used by the witness, and to that end it was proper to show that bad feeling existed, and the reason for it, but that part of the reply of the witness in which he stated that defendant had been convicted of stealing and sent to the chain-gang should have been excluded, and the jury carefully cautioned not to regard it.
"The State had no right at that state of the trial to put so damaging a fact in evidence. The defendant had not put his character in issue at that time. But we think the error entirely cured by subsequent proceedings.
"The defendant was examined as a witness in his own behalf, and testified that he had been indicted for stealing corn and served four months on the chain-gang for it."
In the case at bar the defendant, on cross-examination, said: "I have been in court before, accused of seduction; I was not (717) guilty; I was convicted and sentenced to the penitentiary. I was convicted on the charge of seduction in 1905 or 1906, is my recollection. After my conviction here, I was sustained in the Supreme Court, I think; I've forgotten just how it was. As a matter of fact, that case was settled by a money consideration." Here is an express admission of the evidence to which the defendant had previously objected.
The eighth request for instructions embodies a summary of the defendant's contentions as to the relations hereinabove referred to, and as to the question whether the infliction of the wound was intentional or accidental. We are of opinion that his Honor's charge upon these contentions neither included nor omitted anything to the prejudice of the defendant. *Page 766 
The prisoner requested the following instruction: "It is neither charity nor common sense nor law to infer the worst intent which the facts will admit of if upon a fair consideration of the evidence, a fair and reasonable inference, consistent with his innocence, may as reasonably be deduced as an inference adverse to him and consistent with his guilt. In other words, the law leans to the presumption of innocence and requires that a jury shall be satisfied beyond a reasonable doubt of the guilt of the accused before a verdict of guilty can be rendered. If, therefore, upon certain evidence offered in a cause, a conclusion unfavorable or adverse to the prisoner and consistent with his guilt may reasonably be drawn, and on this same evidence a conclusion favorable to the prisoner and consistent with his innocence may be reasonably drawn, it is the duty of the jury to adopt that inference favorable to the prisoner and consistent with his innocence."
The first sentence is an excerpt from the dissenting opinion in S. v.Neely, 74 N.C. 431. There the defendant was prosecuted for assault with intent to commit rape; and Justice Rodman, emphasizing the proposition that the criminal intent must be proved, said that if the facts should reasonably admit the inference of an intent which, though immoral, was not criminal, it would be neither charity nor common sense nor law to infer the worst intent. In S. v. Massey, 86 N.C. 660, and in S. v. Hawkins, 155 N.C. 472, the language of Justice Rodman
is again applied in a discussion of the criminal intent. But the question here was not whether the defendant inflicted the wound with any particular intent, but whether in fact he inflicted it, and if so, whether intentionally or by misadventure; and the jury had the right, if they found that the defendant used the knife, to infer, unless otherwise convinced, that he did so intentionally. Moreover, if it was intended that the prayer should apply to the question, whether the wound was intentional or accidental, the legal proposition is erroneous. It inferentially (718) imports that each of the hypothesis is equally reasonable, or even if the State's hypothesis is more reasonable than the defendant's, the humanity of the law required the jury to accept the less reasonable and acquit the defendant. In other words, the prayer is subject to the criticism made by the Chief Justice in S. v. Rogers,166 N.C. 390. There he said: "The remark (of Justice Rodman) does not bear the meaning which the defendants seem to attribute to it, that when upon the evidence if the jury believe it one way they should find the defendant not guilty, and if the contrary belief prevails, the jury should find the defendant guilty, they must find according to the humanity of the law that he is not guilty."
Besides, a part of the instruction requested consists of an abstract proposition of law which is not applied to any particular phase of the *Page 767 
evidence. Edwards v. Tel. Co., 147 N.C. 126; McAdoo v. R. R., 105 N.C. 140;Emry v. R. R., 102 N.C. 209; Meredith v. Coal Co., 99 N.C. 576. These objections are sufficient to exclude the entire prayer, even if a part of it was correct; for where a portion of an instruction is erroneous, the court need not give so much of it as is good. S. v. Neal, 120 N.C. 613; S.v. McDowell, 145 N.C. 563.
We have compared with the charge each of the remaining requests and find that the substance of every material principle stated in them — certainly every material principle to which the defendant was entitled — is contained in the instructions given. The court did not adopt the language of each request, and was not required to do so. It is an established rule of practice that a judge is not bound to give instructions in the identical words of a request, if the matter or principle embraced therein is correct and amply presented. Carter v. R. R., 165 N.C. 253; S.v. Tate, 161 N.C. 285; S. v. Price, 158 N.C. 641.
The defendant excepted to the following part of his Honor's charge: "The State says and insists that the evidence, considering the facts and circumstances, the argument of counsel, and the instructions of the court, involuntarily lead your minds to the conclusion that the defendant inflicted the wound, and that it was not done in play, or in accident, that it was intentional, that such act was unlawful, and that it was with malice, if not with premeditation and deliberation." The defendant contends that the reference to the "instructions of the court" is nothing less than the court's intimation of the defendant's guilt — that this instruction expressed the sentiment and opinion of the presiding judge. It will be observed that the paragraph complained of was the recital of certain contentions made by the State, not the application to the evidence of any principle of law; and it is evident that reference to the instructions of the court was a mere inadvertence. It cannot reasonably be construed either as an expression of opinion or as a direction of the verdict. S. v. McNeill, 93 N.C. 552. In addition, (719) an objection to the court's statement of the contentions of the parties cannot first be made after verdict. Phifer v. Comrs.,157 N.C. 150; S. v. Tyson, 133 N.C. 692; S. v. Davis, 134 N.C. 633.
We have carefully considered each of the remaining exceptions. Some apply exclusively to murder in the first degree, and the others require no discussion. The experienced counsel for the defendant have been diligent in his behalf, and the jury, under the comprehensive charge of the court, have returned a verdict for the lesser degree of murder. We think the defendant has no just reason to complain. Perusal of the entire evidence convinces us that he had no really substantial ground for contending either that the homicide was accidental, or that he did not inflict the wound, or that the deceased, for the purpose of alarming and *Page 768 
reforming him, seized the knife and in some unexplainable way brought on her death. These contentions are based on possible inferences rather than on logical deductions from material evidence. Indeed, after scrutiny of the record from a legal viewpoint, we may safely assert, without usurping the functions of the jury, that from all the circumstances disclosed by the evidence only one rational theory may be evolved. However much, in the natural exercise of his faculties, the defendant may have loved his wife, it is not to be doubted that under the influence of drink he took her life. With brain excited, but not to the extent of frenzy, with judgment perverted but not dethroned, with will impaired but not destroyed, upon meeting her at the porch and hearing her mild reproof, he refused to indulge the normal impulse of "love and affection." The enormity of the deed began to temper his mind only when his wife, "with woman's faith and woman's trust," declined to admit his guilt, and fell to the floor. It was then that the "choking and gurgling noise" of his dying companion no doubt roused his sluggish sensibilities to the avenging cry, "Surely I haven't done this!" and his laggard affection, a moment too late, to the unavailing tribute of caresses and tears.
We find no reversible error, and this will be certified to the Superior Court of Burke County.
No error.
Cited: Bailey v. Hassell, 184 N.C. 459; S. v. Baldwin, 184 N.C. 791;Construction Co. v. R. R., 185 N.C. 48; S. v. Williams, 185 N.C. 666; S. v.Miller, 185 N.C. 685; S. v. Reagan, 185 N.C. 713; S. v. Barnhill,186 N.C. 450; S. v. Hart, 186 N.C. 599; S. v. Vaughan, 186 N.C. 760; S. v.Ashburn, 187 N.C. 730; S. v. Sinodis, 189 N.C. 571; S. v. Steele,190 N.C. 510; S. v. Lea, 203 N.C. 26; Tyndall v. Hines Co., 226 N.C. 622.
(720)