` Error.

STATE v. CORNELIUS SINODIS, NICK ZRAKAS, TONY ALFONZO AND MINNIE ALFONZO.

(Filed 29 April, 1925.)

**Criminal Law — Prostitution — Statutes — Evidence—Reputation—Non-suit—Trials.**

> Under the rule that upon a motion as of nonsuit the evidence is to be construed in the light most favorable to the plaintiff, giving him the benefit of every reasonable intendment therefrom, *it is held* that circumstantial evidence is sufficient for the conviction of violation of our prostitution law, C. S., 4357, 4358, tending to show that the three defendants were partners in the cafe or restaurant business where rooms were also rented, with a bad reputation in this respect, and for cursing and drinking, and where rooms were rented for the purpose of illicit intercourse between men and women, and assignments for this purpose were made by two of the proprietors under such circumstances that the other, also indicted, must have known of the immorality for which the place had the reputation.

APPEAL by Cornelius Sinodis, Nick Zrakas and Tony Alfonzo, from *Horton, J.*, and a jury, September Term, 1924, of WAKE.

The defendants, Cornelius Sinodis, Tony Alfonzo, Nick Zrakas and Minnie Alfonzo, were indicted for a violation of the prostitution statutes.

The jury convicted three of the defendants, Cornelius Sinodis, Nick Zrakas and Tony Alfonzo, and rendered a verdict of not guilty as to the defendant Minnie Alfonzo, and the sentence of the court was that the three defendants named be confined in jail for a term of six months each to be assigned to work on the roads of Wake County. The defendants, Cornelius Sinodis, Tony Alfonzo and Nick Zrakas, excepted, assigned errors and appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorney-General Nash, for the State.*
*John R. Hood for Tony Alfonzo.*
*J. S. Griffin for Cornelius Sinodis.*
*H. G. Connor and R. O. Everett for Nick Zrakas.*

CLARKSON, J. Cornelius Sinodis, Nick Zrakas and Tony Alfonzo, were, at September Term, 1924, of Wake Superior Court, convicted of aiding and abetting in prostitution at the Raleigh Cafe.

The defendants were indicted under separate bills, but by consent, the cases were tried together.

The bills of indictment against the defendants were drawn under C. S., as follows:

C. S., 4357. "The term 'prostitution' shall be construed to include the offering or receiving of the body for sexual intercourse for hire, and shall also be construed to include the offering or receiving of the body for indiscriminate sexual 'intercourse without hire. The term 'assignation' shall be construed to include the making of any appointment or engagement for prostitution or any act in furtherance of such appointment or engagement."

C. S., 4358. "It shall be unlawful:

1. To keep, set up, maintain, or operate any place, structure, building or conveyance for the purpose of prostitution or assignation.

2. To occupy any place, structure, building, or conveyance for the purpose of prostitution or assignation; or for any person to permit any place, structure, building or conveyance owned by him or under his control to be used for the purpose of prostitution or assignation, with knowledge or reasonable cause to know that the same is, or is to be, used for such purpose.

3. To receive, or to offer or agree to receive any person into any place, structure, building, or conveyance for the purpose of prostitution or assignation, or to permit any person to remain there for such purpose.

4. To direct, take, or transport, or to offer or agree to take or transport, any person to any place, structure, or building or to any other person, with knowledge or reasonable cause to know that the purpose of such directing, taking or transporting is prostitution or assignation.

5. To procure, or to solicit, or to offer to procure or solicit for the purpose of prostitution or assignation.

6. To reside in, enter, or remain in any place, structure, or building, or to enter or remain in any conveyance, for the purpose of prostitution or assignation.

7. To engage in prostitution or assignation, or to aid or abet prostitution or assignation by any means whatsoever."

At the close of the State's evidence defendants made the motion as of nonsuit. The court reserved its ruling, but later refused the motion. The motion was again made at the close of all the evidence, and again denied by the court.

"On a motion to nonsuit, the evidence is to be taken in the light most favorable to plaintiff, and he is entitled to the benefit of every reasonable intendment upon the evidence and every reasonable inference to be drawn therefrom. *Christman v. Hilliard,* 167 N. C., 6; *Oil Co. v. Hunt,* 187 N. C., 157; *Hanes v. Utilities Co.,* 188 N. C., 465." *Lindsey v. Lumber Co., ante,* 119.

Evidence of a crime may be circumstantial as well as direct. Prostitution is an offense usually committed in secret, and sometimes circumstantial evidence is the only kind that can be obtained. It is sufficient to show facts and circumstances from which the jury may reasonably infer the guilt of the parties. *State v. Eliason,* 91 N. C., 564. From the facts and circumstances, it is a substantial right that the jury must be satisfied of the guilt of the defendants beyond a reasonable doubt. *State v. Palmore, ante,* 538.

All the convicted defendants rely chiefly on the lack of sufficient evidence to go to the jury to warrant a conviction and that the motion of nonsuit should have been granted. Nick Zrakas also seriously contends that there was error in the charge of the court as to him and he should be granted a new trial. A discussion of the evidence to determine its sufficiency under such motion, therefore, becomes necessary.

The three defendants were engaged in running the Raleigh Cafe, which included an eating house below and rooms for lodgers above, in a building on Martin Street in Raleigh. Each has a one-third interest in the business. Zrakas says: "I keep the books and buy the stuff and look after the cafe and dining room. I work there all the time." He had bought into the business about four months before. The other two had been there some time before.

STATE *v.* SINODIS.

· C. S., 4347 and 4360, deals with the reputation of a place.

C. S., 4347. "On a prosecution in any court for keeping a disorderly house or bawdy-house, or permitting a house to be used as a bawdy-house, or used in such a way as to make it disorderly, or a common nuisance, evidence of the general reputation or character of the house shall be admissible and competent; and evidence of the lewd, dissolute and boisterous conversation of the inmates and frequenters, while in and around such house, shall be prima facie evidence of the bad character of the inmates and frequenters, and of the disorderly character of the house. The manager or person having the care, superintendency or government of a disorderly house or bawdy-house is the 'keeper' thereof, and one who employs another to manage and conduct a disorderly house or bawdy-house is also 'keeper' thereof."

C. S., 4360. "In the trial of any person charged with a violation of any of the provisions of this article, testimony of a prior conviction, or testimony concerning the reputation of any place, structure, or building, and of the person or persons who reside in or frequent the same, and of the defendant, shall be admissible in evidence in support of the charge."

The record discloses conditions which must have put an owner of the business on notice as to what was going on. The statute is directed against one who permits a building to be so used "with knowledge or reasonable cause to know that the same is, or is to be, used for such purpose." C. S., 4358, latter part subsec. 2.

Margaret King testified that she went to the cafe on the first of May and stayed until this trouble came up. At another place she said: "I was there for thirty days." She was not at work. She says: "Neal (Sinodis) would say, 'There's a fellow out there who wants a date.' There was nothing to keep him from knowing what I went for. He would come and tell me there were men who wanted to go out riding, and if I saw fit to go, I went. You could hear most any kind of language in there. I have heard cursing and profanity going on in there. They would use it before anyone who would be in there, women and others. I have never heard any other language in there other than cursing and profanity. I went on just like I pleased, and I saw the rest doing the same. I have been in the back part of the cafe and seen people drinking in there."

Jackie Mays testified that she had a room at the cafe. "I had dates with men and others for immoral purposes. Neal would tell me there were young men who wanted to go riding, and if I wanted to go, I went. Most of the time the men would drive up the street and I would walk up the street and get in the car with them. Neal has done that for me several times." She occupied a room in the cafe for immoral purposes.

"I went there with a man. Neal knew he was not my husband. He let us have a room for the night. I did not register. You can get anything you want to; cursing and a lot of vulgarity would be used. I have heard Nick (Zrakas) use it, but never heard Neal. I have known of Neal making dates for other girls, and he made one for me in my room at the hotel." She also testified to vile statement made by Sinodis in the presence of twenty boys and one girl. She said that she did not remember that Nick was there, but Tony was. It is true, she testified, "Nick never made an engagement with me," but it is almost unbelievable that the things of which she testified could have been going on and a part owner of the business, actively engaged in its conduct and there every day, knew nothing about it. Surely, there was reasonable cause for all owners of the business to know that the house was being used for these immoral purposes.

Helen Laws roomed at the cafe a part of March, left, came back, and roomed there again. She also stayed at Alfonzo's house about two weeks. Louise Holderfield and May Lane roomed at Alfonzo's house, and she says that, while at Tony's house, "I made my living like all other sporting girls." The phone in Alfonzo's house was used for the purpose of making her dates. She saw Nick Zrakas about the place. He was working in the cafe. She heard the vulgarity and profanity of all three defendants. Sometimes it was noisy there. Essie Nelson and Bessie Allen were at the place. Louise Holderfield roomed at Alfonzo's house for a couple of months. She made her dates over the telephone. Mrs. Alfonzo would call her to the phone when calls came. Helen Orr and Mary Lane also were there. Nick gave her something to drink.

The reputation of the place was bad. Such is the testimony of Officer Peebles, Mrs. Mamie C. Bradsher, Miss Jeane Perkins, Eckard, R. W. Vinson, J. E. Singleton, T. B. Alderman, J. F. Cain, Ernest Cain, Thompson, and Will Mangum. Mrs. Bradsher heard telephone conversation between Alfonzo and his wife, in which Alfonzo was warning her that a raid was to be made and telling her, "Do not let anything happen to any of our girls. Don't let them have any dates in the house. If you do, they are caught, and if they make any dates, let them be on the outside, and you see to it." Mrs. Bradsher observed indecent conduct in the rooms above the cafe, cab drivers going there and conferring with men who worked at the cafe, and girls come down, get in the cars and drive away. The women who usually went there were street walkers.

Eckard had seen girls come out, get in automobiles with boys and drive off. He heard a cook from the Raleigh Cafe tell some fellows in a Ford that "she" would be down in a minute. Soon afterward a girl came out of the rooming house, got in the car and drove off. A crowd

of boys were continually hanging around, going in and out, cursing. "You could hear any kind of talk going on there, and there was a crowd on Saturday nights as late as three o'clock in the morning. I suppose I have seen at least a dozen different girls there. On one occasion I heard a Greek fellow tell a fellow that 'she' would be down in a minute."

The language used by Neal's wife was so indecent and vile that the witness, Jackie Mays, did not use it. Burns testified that it was not a decent house. Observed a great crowd around there, peeping in at the doors. He had seen fights there.

The evidence was sufficient to take the case to the jury and to justify the conviction of the three defendants. The place was operated by the three together. They rented rooms from time to time for a considerable space of time to women whom they must have known were prostitutes. These women, Margaret King, Louise Holderfield, Jackie Mays, Helen Laws, who testified as witnesses in the case, and the others, Helen Orr, Mary Lane, Bessie Allen and Essie Nelson, must have been known to be women of lewd character, and their purpose in renting rooms here or in the home of Alfonzo must have been apparent. The owners of the building must have known the purpose for which the rooms were sought, and it is unreasonable that Zrakas could have remained there, in active control of its operation, without participating in the offenses and knowing what his fellow-owners were doing. It is clearly shown that Sinodis was making engagements for these women. At the least, all of them were aiding and abetting in the offense.

Nick Zrakas contends that there is prejudicial and reversible error as to him. That the court below in stating the contentions of the State said: "And the State says that it has shown you from the testimony of Jackie Mays that she also used a room in that building for the purpose of prostitution and assignation, even going so far as to permit sexual intercourse with Nick Zrakas."

Jackie Mays, in her testimony, said: "Nick never made an engagement with me. The only one who made an engagement with me was Neal. I went down on one occasion and registered under an assumed name, but Neal knew me and knew the man was not my husband." And again Jackie Mays testified in rebuttal as follows: "I have stayed at the Raleigh Cafe three different times. The first time I stayed there was in February; the next time was in March." And again, when recalled the second time, "I know the Greek, Goss. When I was down there he stayed there in the daytime and worked at night. He stayed in the room with me. I cannot say that the other men knew he was staying in the room with me."

It is conceded Jackie Mays did not testify that she had permitted Nick Zrakas to have sexual intercourse with her, and that the court below was in error in giving such as a contention of the State. Her evidence had reference to a Greek named Goss. While the statute (C. S., 564) requires the judge to state the evidence given in the case in a plain and correct manner and declare and explain the law arising thereon, we cannot hold such a slight inadvertence for reversible error in the present record. The evidence is plenary as to the guilt of all the defendants, and it is apparent, we think, from the whole case, that the jury could not have been misled by this misstatement, which was no more than a "slip of the tongue." Besides, counsel for this defendant could easily have called the matter to the court's attention and the same could have been corrected then and there.

In *State v. Barnhill,* 186 N. C., p. 450, it is said: "If the recitals of the court were incorrect as to the facts of the case, it was the duty of the defendant to call the court's attention to it, so that the correction could be made then and there. If this was not done at the time, the defendant cannot complain and wait and except when the case is made up on appeal. The rule is stated in *S. v. Baldwin,* 184 N. C., 791, as follows: 'We have so often said that the statement of contentions must, if deemed objectionable, be excepted to promptly, or in due and proper time, so that, if erroneously stated, they may be corrected by the court. If this is not done, any objection in that respect will be considered as waived. We refer to a few of the most recent decisions upon this question: *S. v. Kincaid,* 183 N. C., 709; *S. v. Montgomery,* 183 N. C., 747; *S. v. Winder,* 183 N. C., 777; *S. v. Sheffield,* 183 N. C., 783.' See *S. v. Williams,* 185 N. C., 666." *State v. Ashburn,* 187 N. C., 723; *State v. Galloway,* 188 N. C., p. 416; *State v. Beavers,* 188 N. C., 595.

There was abundant evidence to be submitted to the jury—direct and circumstantial—as to the guilt of all three defendants of aiding and abetting in prostitution. All three had an interest in the Raleigh Cafe, below was the eating place—day and night—and above were the rooms which numerous women rented and frequented off and on for months. Some of the defendants made dates for immoral purposes for them. Eleven witnesses testified that the general reputation of the place was bad. One of the witnesses testified: "I know the character of the women that would come in and out; they were usually girls that we would usually call 'street walkers.' "

The evidence against Nick Zrakas was not as strong as against the other two convicted defendants, but, from the evidence, he could not help but know (not being a blind man) the character of the women and the character of the place the partnership was engaged in running, and

he was aiding and abetting in furnishing meals, etc., and as a partner profiting in the nefarious traffic in prostitution.

As to the extent of punishment of Nick Zrakas in reference to the others, this Court cannot enter into. We can only pass on "any matter of law and legal inference."

We cannot hold the inadvertence in the contentions prejudicial or reversible error as to Nick Zrakas. On the entire evidence the motion of nonsuit cannot be allowed as to any of them.

For the reasons given in the judgment of the court below, there is No error.