## STATE v. ROBERT J. HART.

### (Filed 5 December, 1923.)

**1. Criminal Law—Principals—Aiders and Abettors.**

An aider or abettor is one who advises, counsels or procures, or who encourages another to commit a crime, whether personally present or not at the time and place of the commission thereof, and when two persons aid and abet each other therein, both being present, both are principals and equally guilty.

**2. Same—Statutes—Females—Carnal Knowledge.**

One who accompanies in an automobile another who accomplishes his purpose of having carnal knowledge of a female child over twelve and under eighteen years of age, in violation of C. S., sec. 4209; and with knowledge of this purpose leaves them together in the automobile at night until the purpose has been accomplished, though the female consents, is guilty as an aider or abettor in the commission of the offense, and punishable as a principal therein.

**3. Instructions—Statutes—Expression of Opinion.**

It is not required by C. S., sec. 564, that the judge intimate in the direct language of his charge his opinion of whether, upon the evidence, a fact is fully or sufficiently proved, and if such intimation is reasonably inferred from his manner or his peculiar emphasis of the evidence, or in his presentation thereof or his form of expression, or by the tone or general tenor of the trial, giving advantage to the appellee thereby, such as to impair the credit which might otherwise, under normal conditions be given by the jury to the testimony, it comes within the prohibition of the statute, and a new trial will be ordered on appeal.

**4. Constitutional Law — Criminal Law — New Trials — Custody of Defendant.**

In preserving to the defendant in a criminal action a fair trial in accordance with the bill of rights preserved to him by our Constitution, and in granting him a new trial in the Superior Court, it does not necessarily follow that he is to be discharged from the custody of the courts.

CLARKSON, J., dissenting; CLARK, C. J., concurring in the dissenting opinion.

APPEAL by defendant from *Bond, J.,* at February Term, 1923, of GRANVILLE.

Criminal prosecution tried upon an indictment charging H. S. Hicks and Robert J. Hart with having carnal knowledge of a female child over 12 and under 14 years of age, who had never before had sexual intercourse with any person. C. S., 4209.

The alleged offense of which the defendant was convicted occurred on 6 February, 1923, while the Superior Court of Granville County was in session. There was a preliminary hearing on the following day, before a justice of the peace, and both Hicks and Hart were bound over to the Superior Court. The case against Hart was tried in the Superior Court at the term then in session. Hicks, who was engaged in some highway work at Oxford, failed to appear and forfeited his bond. The material facts are as follows:

On the night of the alleged offense the defendant Hart, a boy 16 years of age, was returning to his work at Lyon's Drug Store, when he saw Hicks and a companion named Gill engaged in a conversation on the street. He stopped to talk with them, and very soon Gill mentioned the name of the prosecutrix. Hicks asked the defendant Hart if he knew the girl, and requested that he go with him in his one-seated Ford coupé to her home and they would bring her to the drug store for a drink. This Hart agreed to do.

When they reached the home of the prosecutrix, Hicks remained in the automobile while Hart went to the door and asked for the girl. They had some conversation about going to the drug store; and, after obtaining her mother's consent, the prosecutrix got into the car with Hicks and Hart, she sitting on the seat between them, and Hicks drove away. When they reached the corner at which it was necessary to turn in order to go to the drug store, Hicks drove his car in the opposite direction. Hart asked if they were not going to the drug store. Hicks said they did not want a drink, and the prosecutrix said that she would just as soon ride around.

As they were riding out College Street, Hicks and the prosecutrix engaged in a conversation which Hart could not hear on account of the noise of the machine. When they had passed out beyond the hospital and across the railroad, Hicks stopped the car on the side of the road and asked Hart if he had a rubber. (The prosecutrix said on her direct examination in the Superior Court that Hart asked Hicks about a rubber, but on her cross-examination she said she did not know which one asked the question. On her examination before the magistrate she said Hicks made the inquiry, and this is in accord with Hart's testimony.)

From this point on there is a conflict in the evidence for the State and that of the defendant.

The prosecutrix testified that Hicks offered to get out of the car first, but that Hart said no, he would get out, and he did. Hicks then had sexual intercourse with the prosecutrix without any resistance on her part, as she testified: "I did not attempt to resist. He was in the car with me about seven minutes. Hicks got up and did not say anything. Robert Hart was then standing at the door of the car. Hicks got out of the car. Hart got in the car. He said he was going to do what Hicks did. I told him that he was not, and he blew the horn and Hicks got in and turned the car around and we came back to town."

Hart testified that he had no knowledge of Hicks' ulterior purpose until he asked about a rubber, and that he then told Hicks that if he was going to do anything like that he would get out of the car and go back to town. He did get out and had started back when he decided that, as he had gone to the girl's home and asked her to go with them for a drink, he ought not to leave her; whereupon he turned around and went back to the car and they all three came back to Oxford. When they reached the home of the prosecutrix, Hart helped her out of the car and went to the door with her. She asked him what excuse she should give her mother for staying out so late. Hart suggested she might say they were detained at the store on account of a rush and he was busy waiting on customers.

The prosecutrix told her mother, soon after she reached home, that she had been abused, but she stated to her father that Hart had treated her like a gentleman. He did not have intercourse with her. The prosecutrix further testified that she was 13 years old and had never had intercourse with any other person; that she had not been introduced to Hicks before that night, though she had talked with him on the street.

Hart was convicted of aiding and abetting Hicks in the commission of the alleged offense and sentenced to five years in the State's Prison. He appeals, assigning errors.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*Hicks & Stem, Parham & Lassiter, and Brogden, Reade & Bryant for defendant.*

STACY, J. The defendant's demurrer to the evidence and motion for dismissal, or for judgment as of nonsuit under C. S., 4643, was properly overruled. An aider and abettor is one who advises, counsels, procures, or encourages another to commit a crime, whether personally present or not at the time and place of the commission of the offense. 2 C. J., 1024. And if two persons aid and abet each other in the commission

of a crime, both being present, both are principals and equally guilty. *S. v. Jarrell,* 141 N. C., 722; *S. v. Skeen,* 182 N. C., 844.

In *S. v. Davenport,* 156 N. C., p. 614 (opinion by *Walker, J.*), it is said: "A person aids and abets when he has 'that kind of connection with the commission of a crime which, at common law, rendered the person guilty as a principal in the second degree. It consisted in being present at the time and place, and in doing some act to render aid to the actual perpetrator of the crime, though without taking a direct share in its commission.' Black's Dict., p. 56, citing 4 Blackstone, 34. An abettor is one who gives 'aid and comfort,' or who either commands, advises, instigates, or encourages another to commit a crime—a person who, by being present, by words or conduct, assists or incites another to commit the criminal act (Black's Dict., p. 6); or one 'who so far participates in the commission of the offense as to be present for the purpose of assisting, if necessary; and in such case he is liable as a principal.' 1 McLain Cr. Law, sec. 199."

But mere presence, and no more, is not sufficient to make one an aider and abettor. "For one who is present and sees that a felony is about to be committed, though he may do nothing to prevent it, does not thereby participate in the felony committed. Every person may, upon such an occasion, interfere to prevent, if he can, the perpetration of sô high a crime; but he is not bound to do so at the peril, otherwise, of partaking of the guilt. It is necessary, in order to have that effect, that he should do or say something showing his consent to the felonious purpose and contributing to its execution, as an aider and abettor." *Ruffin, C. J.,* in *S. v. Hildreth,* 31 N. C., 440.

To like effect is the language of *Chief Justice Smith* of the Supreme Court of Mississippi in the recent case of *Crawford v. State,* 97 So., 534: "In order for one to aid and abet the commission of a crime he must do something that will incite, encourage, or assist the actual perpetrator in the commission of the crime. Mere presence, even with the intention of assisting in the commission of a crime, cannot be said to have incited, encouraged, or aided the perpetrator thereof, unless the intention to assist was in some way communicated to him. The law does not punish intent which is without influence on an act."

Again, in *Burrell v. The State,* 18 Tex., p. 732, *Wheeler, J.,* quoting from Roscoe Cr. Ev., 213, says: "Although a man be present whilst a felony is committed, if he take no part in it, and do not act in concert with those who committed it, he will not be a principal in the second degree, merely because he did not endeavor to prevent the felony, or apprehend the felon." See, also, Whart. Am. Cr. L., 6364; Whart. L. Homicide, 157.

The following are the defendant's main exceptions and assignments of error:

1. At the close of the State's evidence, the defendant's motion for judgment as of nonsuit was overruled. Then the solicitor, as the court was about to take a recess for the night, in open court, and in the presence of the jury, addressed the court and prayed the defendant into custody. The defendant was under a bond of $1,000, which had been ordered given the previous week of the court, and under order of the court, the bond was conditioned upon the appearance of the defendant each day during the term and not to depart without leave. In the presence of the jury, the presiding judge ordered the defendant into the custody of the sheriff. No question was raised by the solicitor as to the sufficiency of the sureties on the bond. The court stated, in the hearing of the jury, that putting the defendant in custody did not mean at all that the court thought he was guilty. To both the prayer of the solicitor and the order of the court, in the presence of the jury, the defendant excepted.

2. In the course of his Honor's charge to the jury he said: "The law used to be if a man had connection with a girl under 10, it was a capital felony, and if between the ages of 10 and 12, it was a felony if she had never before had sexual intercourse. The Legislature later moved the age of consent up to 14 (and a few days ago, one House of the Legislature passed a bill, I believe, moving the age of consent up to 16 years)." Exception by defendant to that part in parenthesis.

3. Again in the charge: "The defendant introduced certain character witnesses, the Rev. Mr. Black, the chief of police, a man named Floyd, and several others. They all stated his character was good. You will remember who the witnesses were and what they said. In answer to this character evidence, the State contends that neither of these character witnesses said Hart didn't go out with Hicks to have connection with the girl, and did not testify as to what did or did not take place." Exception by defendant. See opinions of *Henderson, C. J.,* and *Daniel, J.,* in *S. v. Lipsey,* 14 N. C., 485.

4. Still again in the charge: "Every case of this nature, if the defendant's guilt be established, which results in an acquittal, tends to injure society." Exception by defendant.

5. And again in the charge: "I am not appearing for either side. I am not interested in Mr. Hart's acquittal, and I am not especially interested in his conviction, but I am interested in seeing that both the State and the prisoner have a perfectly fair trial." Defendant excepted.

6. The defendant also excepted because in the charge his Honor repeatedly called the attention of the jury to the contentions of the State, while but slight reference was made to the contentions of the defendant.

7. Finally, the defendant excepted for that his Honor failed to instruct the jury as to the law relating to aiding and abetting, but simply charged the jury that the defendant Hart would be guilty if he aided or abetted Hicks, without any explanation or instruction as to what constituted aiding and abetting.

Defendant earnestly contends that these exceptions, taken as a whole, or in their totality, if not singly, make it quite clear that his Honor, at times during the trial, was inadvertent or inattentive to the provisions of C. S., 564, which provides: "No judge, in giving a charge to the petit jury, either in a civil or a criminal action, shall give an opinion whether a fact is fully or sufficiently proven, that being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon."

This statute has been interpreted by us to mean that no judge, in charging the jury or at any time during the trial, shall intimate whether a fact is fully or sufficiently proved, it being the true office and province of the jury to weigh the testimony and to decide upon its adequacy to establish any issuable fact. It is the duty of the judge, under the provisions of the statute, to state in a plain and correct manner the evidence given in the case and to declare and explain the law arising thereon, without expressing any opinion upon the facts. *Morris v. Kramer,* 182 N. C., 87; *S. v. Cook,* 162 N. C., 586; *Park v. Exum,* 156 N. C., p. 231. "There must be no indication of the judge's opinion upon the facts, to the hurt of either party, either directly or indirectly, by words or conduct." *Bank v. McArthur,* 168 N. C., p. 52. And in *S. v. Ownby,* 146 N. C., p. 678, it was said: "The slightest intimation from a judge as to the strength of the evidence, or as to the credibility of a witness, will always have great weight with a jury and, therefore, we must be careful to see that neither party is unduly prejudiced by any expression from the bench which is likely to prevent a fair and impartial trial."

The judge may indicate to a jury what impression the testimony or evidence has made on his mind, or what deductions he thinks should be made therefrom, without expressly stating his opinion in so many words. This may be done by his manner or peculiar emphasis or by his so arraying and presenting the evidence as to give to one of the parties an undue advantage over the other; or, again, the same result may follow the use of language, or form of expression calculated to impair the credit which might otherwise and under normal conditions be given by the jury to the testimony of one of the parties. *S. v. Dancy,* 78 N. C., 437. It can make no difference in what way or when the opinion of the judge is conveyed to the jury, whether directly or indi-

rectly, or by the general tone and tenor of the trial. The statute forbids an intimation of his opinion in any form whatever, it being the intent of the law to insure to each and every litigant a fair and impartial trial before the jury. "Every suitor is entitled by the law to have his cause considered with the 'cold neutrality of the impartial judge' and the equally unbiased mind of a properly instructed jury." *Withers v. Lane,* 144 N. C., p. 192.

The able and learned judge who presided at the trial of this cause was inspired, no doubt, by a laudable and profound sense of justice, but we think it is quite clear, from the above exceptions, that an unfavorable impression against the defendant was conveyed to the jury by his Honor, unintentionally, of course, and in an earnest desire to see that the right, as he conceived it, should prevail. But just here the law, conscious of the frailty of human nature at its best, both on the bench and in the jury box, intervenes and imposes its restraint upon the judge, enjoining strictly that he shall not in any manner sway the jury by imparting to them the slightest knowledge of his own opinion of the case. "A charge, therefore, which indicates to a jury what is the opinion of the court upon the evidence violates the act. We all know how earnestly, in general, juries seek to ascertain the opinion of the judge trying the cause, upon the controverted facts, and how willing they are to shift their responsibility from themselves to the court. The governing object of the act was to guard against such results—to throw upon the jurors themselves the responsibility of responding to the facts of the case. Nor is it proper for a judge to lead the jury to their conclusions on the facts." *Nash, C. J.,* in *Nash v. Morton,* 48 N. C., p. 6.

Our most able and upright judges, at times, have inadvertently overstepped the limits fixed by the law; and in each case this Court has enforced the injunction of the statute and restored the injured party to a fair and equal opportunity before the jury. Our view that the statute has been violated in the instant case is sustained by the authorities already cited, and to which the following may be added: *S. v. Rogers,* 173 N. C., 755; *S. v. Horne,* 171 N. C., 787; *Chance v. Ice Co.,* 166 N. C., 495; *Ray v. Patterson,* 165 N. C., 512; *Sprinkle v. Foote,* 71 N. C., 411; *Powell v. R. R.,* 68 N. C., 395; *Reiger v. Davis,* 67 N. C., 185; *S. v. Bailey,* 60 N. C., 137; *S. v. Dick,* 60 N. C., 440; *S. v. Pressley,* 35 N. C., 494; *S. v. Thomas,* 29 N. C., 381; *S. v. Davis,* 15 N. C., 612; *Reel v. Reel,* 9 N. C., 63.

Speaking of a similar situation in *S. v. Dick, supra, Manly, J.,* said: "This (referring to the statute), we suppose, has been adopted to maintain undisturbed and inviolate that popular arbiter of rights, the trial by jury, which was, without some such provision, constantly in danger from the will of the judge acting upon men mostly passive in their

natures, and disposed to shift off responsibility; and in danger also from the ever active principle that power is always stealing from the many to the few. We impute no intentional wrong to the judge who tried this case below. The error is one of those casualties which may happen to the most circumspect in the progress of a trial on the circuit. When once committed, however, it was irrevocable, and the prisoner was entitled to have his case tried by another jury."

The capable and painstaking judge who presided at the trial did not intend to prejudice the defendant's case, but, after a careful and earnest consideration of the record, we are constrained to believe that the defendant is entitled to a new trial, and such will be awarded.

In view of the wide range of discussion which the case has taken, it may not be amiss to remark that the defendant is not to be released or discharged; he is to be tried again. A new trial does not mean an acquittal; it signifies an effort and determination on our part, in keeping with numberless precedents, to preserve to the defendant his constitutional right of trial by jury. 24 Cyc., 100. This right, says *Judge Story,* is justly dear to the American people; it has ever been esteemed by them as a privilege of the highest and most beneficial nature. See, also, 3 Bl. Com., 271.

"The just purpose and excellence of trial by jury, especially in criminal cases, are not imaginary and whimsical, or the outgrowth of popular ignorance and persistent clamor. While it is not perfect as a method of trial, has its imperfections, and is sometimes perverted and prostituted, nevertheless the practical experience of one of the freest and most enlightened nations of the earth for centuries and of this country during all the time of its existence, the sanction of it by the wisest statesmen and jurists in different ages, as well as common sense, have proved its inestimable value as the best method of trial, in criminal cases especially, and the necessity for it as a constituent provision in any system of free government." *Merrimon, J.,* in *S. v. Holt,* 90 N. C., p. 751.

It is our duty, under circumstances like the present, to declare the law with impartial neutrality and to hold the scales of justice with an even hand. To this end, it is expressly enjoined in the bill of rights that no man shall be "deprived of his life, liberty, or property but by the law of the land." As the case goes back for another hearing, by reason of what we conceive to be an erroneous expression of opinion by the trial court, we refrain from any discussion of the evidence.

After a careful scrutiny of the record, we have arrived at the conclusion that the defendant, in the present case, has not been tried in accordance with the law as it prevails in this jurisdiction. It is fundamental with us that every citizen, charged with crime, shall be given a

fair, impartial and lawful trial by a jury of his peers. We think his Honor overstepped the bounds, inadvertently of course, but nevertheless to the prejudice of the defendant. The writer knows from a personal acquaintance with the trial judge, and from the records which come to this Court, that he usually protects, with sedulous care, the rights of a defendant in a criminal prosecution as well as those of the State. He was not conscious of expressing any opinion adverse to the defendant in this case, but we think the jury must have so understood his remarks, as appears from the above exceptions.

*Venire de novo.*

CLARKSON, J., dissenting: It is with regret that I cannot agree with the majority opinion in this case.

The statute under which the defendant was indicted, C. S., 4209, is as follows:

"Obtaining carnal knowledge of virtuous girls between 12 and 14 years old. If any person shall unlawfully carnally know or abuse any female child over twelve and under fourteen years old, who has never before had sexual intercourse with any person, he shall be guilty of a felony and shall be fined or imprisoned in the State's Prison, in the discretion of the court."

The Legislature of North Carolina, chapter 140, Session 1923, amended the above act to read as follows:

"If any male person shall carnally know or abuse any female child over twelve and under sixteen years of age, who has never before had sexual intercourse with any person, he shall be guilty of a felony and shall be fined or imprisoned in the discretion of the court; and any female person who shall carnally know any male child under the age of sixteen years shall be guilty of a misdemeanor and shall be fined or imprisoned in the discretion of the court: *Provided,* that if the offenders shall be married or shall thereafter marry, such marriage shall be a bar to further prosecution."

This act was passed 3 March, 1923, and went into effect 1 July, 1923. The good women of the State used their influence with the 1923 Legislature of North Carolina to extend the "age of consent" from fourteen to sixteen.

The Legislature of the State in these acts used the words *female child.* The purpose of these acts was to protect the girl children of the State, in their purity and innocency, from the unbridled passion and lust of evil, amorous men—human spiders—who would ensnare purity and innocency, and when caught in the net they would become helpless victims. To protect the female girlhood from them that lay in wait and lurk privily to destroy virtue. The motive of the law-makers was

for purity and virtue among the girl children of the State. Uncon-
scious in their innocent childhood as a bird caught and trapped in the
snare and knoweth not that it is for her destruction.

Has the defendant violated this laudable statute? Was he tried
fairly and convicted, as he was, by a jury of twelve men, and in ac-
cordance with the rules of law of this State? I think he was. Let us
examine the facts in this case upon which the defendant was convicted.
The defendant, Robert J. Hart, and one H. S. Hicks were indicted
jointly. Hicks is a fugitive from justice, and only Hart was on trial.
The child, Deloris Mangum, testified that she was 13 years old and
living with her father and mother in Oxford. She knew both Hart
and Hicks, the former about a year and the latter about six months.
She had never been introduced to Hicks, but had talked to him on the
streets. Hart was a clerk in a drug store in Oxford and Hicks was
working in a highway construction office. Neither had ever visited
her at her father's home. On the night of 6 February Hart came to
the front door of her home about six o'clock. Deloris Mangum testi-
fied: "I went to the front door and he asked me if I did not want to
go to the drug store and get a drink. I told him it was too late and
that I was not dressed. He said that was all right, and I went to the
kitchen and asked mother, and she asked who Robert Hart was, and
I told her he was Allie Hart's brother. She went to the door and I
heard Robert Hart tell her we would not be gone long. She said it
was mighty late, but consented for me to go. I went with Robert to
the car. It was a Ford coupé and had one seat. It was Hicks' car
and he was driving. We turned and went up Pennsylvania Avenue
to College Street corner and then turned to the left up College Street.
If going to the drug store we should have turned to the right at the
corner. I did not say anything when we turned to the left at the
corner. I did not say anything when we turned up College Street in-
stead of going to the drug store. We went up College Street and out
on the asphalt road to the other side of the hospital, across the railroad
track about 200 yards. Hicks was driving and stopped the car on the
side of the road. Robert Hart asked Hicks if he had a rubber. Hicks
said 'No.' Hicks said he would get out, Hart said no he would get out.
Hart got out of the car and walked away up the road. Hicks asked
me how long it was before my periods. I told him about two weeks,
he said that was all right and told me to lie down. I laid down on the
seat with my head next to the steering wheel. He kissed me. I un-
fastened my bloomers and he took one leg of them down. He then had
sexual intercourse with me. I did not resist. Hicks got up and said
nothing. Hart was standing at the door of the car. Hicks got out of
the car and Hart got in. He said he was going to do what Hicks did.

I told him he was not. He blew the horn and Hicks got in and turned the car around and we came back to town. I was in the car alone with Hicks about seven minutes. On the way back we stopped to get the ice off of the windshield. There was snow and sleet on the ground. Hart told me to tell my mother the reason we were late they had a rush at the drug store. I do not know where my father was. Hart got out of the car and went to the door with me. My father came up and told him never to come there again and take me off. I went in the house and my mother asked me where I had been, and I told her they had insulted me and they treated me just like married folks. I did not tell my father. My mother told him. Dr. Watkins came after supper and examined me. I told him what had been done. I had never had sexual intercourse with any one before that time." She stated that she would be 14 years old next September. On cross-examination she said that she did not know which one asked about the rubber, and she told her father that Hart had treated her like a gentleman.

Mrs. Mary Ella Mangum, the mother, and Elvis Mangum, the father, of Deloris Mangum, corroborated her in all material matters. Her mother testified that the morning of the preliminary examination "she was very nervous. She was a nervous wreck."

Her father, Elvis B. Mangum, testified that when he got home in the evening his wife was nervous and worried and told him that Deloris had gone to the drug store with Robert Hart, and he immediately went in search of her.

Dr. G. S. Watkins, a physician who examined her, corroborated her and said: "I give it as my opinion that she had never had sexual intercourse with any person before this time," and further, at the preliminary examination, "she was very nervous."

On the preliminary examination Deloris Mangum said: "He told me to lie down, and laid me down. I did not attempt to resist. I did not say anything. I knew it was no use. He laid me down on the seat. After he laid me down he kissed me. I did not say anything. He got on me; he had intercourse with me. He did not say anything. When I saw Robert Hart he was standing at the car door. When Hicks got up he got out, and Robert got in." In the Superior Court examination she said, "He said he was going to do what Hicks did. I told him he was not."

There was testimony that the character of Deloris Mangum and that of her father and mother were good.

This was in substance the State's testimony.

Robert J. Hart, the defendant, was examined in his own behalf, and his testimony corroborated that of Deloris Mangum in many particulars. He was 17 years old, and testified, in part: "I did not know that

any such thing was going to be attempted. I left the store and got in the car with Hicks. I thought that he just wanted to meet the girl and that we would bring her to the store and get a drink."

In the defendant's evidence are the ear-marks of the web that they were weaving for this young girl, and the conspiracy can be traced in defendant's evidence. After trapping her, they destroy her character and thus obtain an acquittal. Cullom Hester testified that he saw Deloris Mangum and Alvin Eakes on 16 January, 1923, in a Ford roadster near a path that comes into the Salem road, and Charles Hester said that he was with his son and that his son said the boy and girl were Deloris Mangum and the Eakes boy. Ralph Turner testified that he was a student at Oxford High School, and that he saw Deloris Mangum get in a car in front of the High School building on the afternoon of 16 January and go out towards the Salem road. To like effect was the testimony of Bailey Currin. On cross-examination he said that Robert Hart came to him and said, "I am in trouble with a girl and she has squealed on me, and you have got to help me out." This is a plain admission by Hart, testified to by his own witness. The statute does not allow "consent" by a virtuous child.

The young men at the school, from this incident, commenced talking about Deloris Mangum. Alvin Eakes, in rebuttal of anything wrong, said that about 3 o'clock in the evening of 16 January, 1923, he did not have much to do and he got in his Ford roadster and went to the Oxford High School building and stopped his car in front of the building. Deloris Mangum got in the car and he told her he would take her home, and he drove her around Oxford, but was never on the Salem road. This was in the afternoon, about 3 o'clock—day-time. Deloris Mangum corroborated Eakes and denied she had ever met Charles or Cullom Hester on the afternoon of 16 January on the Salem road, and stated that she had known Eakes ever since she could remember. The incident of young Eakes and Deloris going to ride in the afternoon commenced to be whispered around. These young people (she a high-school girl) took a ride in broad daylight, with a playmate she had known all her life. The whispers started from evil minds.

What does the defendant Hart say on that fatal night for Deloris Mangum, 6 February, 1923?: "Late in the afternoon of 6 February I left the store to get my supper. I went to my uncle's, and when I came back up town I saw H. S. Hicks and a boy named Edward Gill at the foot of the steps leading up to General Royster's office. They were talking, and I came up, and Gill told Hicks that he knew a girl who was crazy to meet him. I said, 'I bet I know who it is.' Gill said to me that I was thinking about that Mangum girl. I told him that I was not thinking of her especially. I went in Pittman's drug store,

38—186

which was next door to where we were standing. Hicks came in and sat down at a table with me. He asked me to go with him down to her home. I told him that it was too late, and that I had to go back to work in a few minutes. It was nearly six, and I was supposed to be back at my work about six. He said that he would not be away but a few minutes and that we would bring the girl to the drug store. He said that his car was out there on the street. He said, 'Come and let's go,' and that I could go straight back to work. I got in the car with him and went. When we got to Mr. Mangum's I went in; a little boy met me at the door. I asked for Deloris Mangum, and she came to the door. I asked her if she did not want to go to the drug store and get a drink. She said that she did, but that she was not dressed. I told her that was all right, and to ask her mother. She went to ask her mother, and Mrs. Mangum came to the door. I spoke to her, and she said that she needed her daughter to help about the supper, but that she could go. We went and got in the car; it was a Ford coupé, and Deloris Mangum sat between us."

On cross-examination he testified: "Knew the hospital was not far from where the car stopped. I did not try to give any alarm after I got out of the car. There was snow on the ground. I got out and started back to town, and then I thought that I ought to go back, because I had invited the girl to go with us in the car. I went back to the car. I did not try to have intercourse with the girl. I had never made any plan with Hicks to get the girl out. I had talked with the girl before in the drug store, but had not had any conversation with her that day. *When the car stopped near the hospital and Hicks asked me about the rubber, I knew what he was going to do. When I got out of the automobile I knew what was going to happen.* I said to Hicks, 'I'll get out if you are going to do anything like that.' I did not make any outcry or give any alarm. I did ask Deloris for an engagement the following night. I asked her how about coming to see her, and she said she didn't know."

This much of the crime, as charged, on all the evidence, is undisputed:

1. That the child was under fourteen years old.

2. That she had never before had sexual intercourse with any person. (Her own testimony and that of Dr. Watkins, her physician.)

H. S. Hicks, who actually committed the crime, has fled from the State.

The only question of fact disputed is: Was Robert J. Hart an aider and abettor? The jury of twelve men has so found. Does the evidence justify this finding? Has the able and conscientious judge, W. M. Bond, who presided at the trial, committed any error in law?

The foul suspicion had been whispered in the ears of the lustful young men at the high school and those loafing about the drug store. Gill and Hart and Hicks talking about the Mangum girl on the street, at the steps of General Royster's office. They go to Pittman's drug store. Hicks and Hart sit down together in the drug store. They commenced talking about Deloris Mangum. The two agree to go down in Hicks' car and bring the girl to the drug store. The two went together, in Hicks' car. Hart goes in, and Hicks waits out in his car. Hart obtains Deloris Mangum's mother's consent, under a promise and trust that he would take her, the little high-school girl, to the drug store, and bring her back. He took her that winter night from the mother and the home of her father, and as she stepped from her home to the snow on the ground she was as clean and pure and white as snow, from the evidence, and when he brought her back she was as a lily dipped in soot. Shall he be turned loose? A judge and a jury of twelve men in his own county say not. He says, "When the car stopped at the hospital and Hicks asked me about the rubber, I knew then what he was going to do." They—Hicks and Hart—both knew all about the implement of the seducer and debaucher. Hart and Hicks took her away that cold winter night—these two conspirators—beyond the hospital, across the railroad some two hundred yards—away from the lights of the city into the darkness and night, to accomplish the deed. When the wrong was done, Deloris testified: "Hicks got up and did not say anything. Robert Hart was then standing at the door of the car. Hicks got out of the car. Hart got in the car. He said he was going to do what Hicks did. I told him he was not."

Hart, himself, who took this child to her ruin, said Deloris Mangum asked what she should tell her mother, and said to him, "Tell me something to tell her," and he told her she could tell her mother that "we had had a rush at the drug store and I had to work, if she wanted to."

The cry of this child. In her agony she thought of her mother. She was entrusted by her mother to Hart. What shall I tell her who suffered and bore me? Hart told her to tell her an untruth. He got her from the home under a false pretense, that he was going to take her to the drug store, and he returns her to tell an untruth. But she told her mother the truth. "I told my mother they had insulted me—they treated me just like married folks."

When the blood of Abel was spilled, Cain, who did the deed, was asked that momentous question, "Where is Abel, thy brother?" and he said, "I know not; am I my brother's keeper?" Cain told an untruth. Hart, who aided and abetted, as found by the jury, told the child to tell an untruth to cover up his own wrongdoing.

I have given the material facts as I conceive them to be, presented on the record. Now, as a matter of law, has the court below erred and not given the defendant a fair trial? In accordance with the law of the land he is entitled to this. This is a land of law and orderly government. No man or set of men are above the law. The hope of civilization is obedience to law.

There is no difference between the majority opinion and myself that the defendant's demurrer to the evidence, or, as defendant puts it, "at the conclusion of all the testimony the defendant again renewed his motion for judgment as of nonsuit," that this motion was properly overruled, and there was sufficient evidence to go to the jury—that Hart was an aider and abettor.

The only debate is, during the progress of the trial did the court below commit error or prejudicial or reversible error?

The law of what constitutes "aider and abettor" in the majority opinion is law so far as it goes, and the law as therein stated is sufficient on a new trial for the jury to pass on the facts, but our authorities go further.

In S. v. Cloninger, 149 N. C., 572, the Court says: "John Cloninger and Charles Costner were aiders and abettors. There is abundant evidence to sustain a conviction, where the bystander is a friend of the perpetrator and knows that his presence will be regarded by the perpetrator as an encouragement and protection." S. v. Jarrell, 141 N. C., 725.

"A servant who stands passive and knowing that his employer is being robbed, permits it, is guilty as principal." In re Sherman, 6 City Hall Record (N. Y.), 2.

Hart was intrusted with the care of Deloris Mangum and he stood by and saw her robbed of her virtue.

In the Jarrell case, supra, quoted in the majority opinion, Brown, J., says: "There is much in the conduct of Jarrell, according to the evidence, which indicates a design to encourage and aid Hicks in an assault. 'When a bystander is a friend of the perpetrator and knows that his presence will be regarded as encouragement and protection, presence alone may be regarded as encouraging.' Wharton, supra, sec. 211a, who cites many cases in support of the text. Jarrell was in a situation to be able readily to go to Hicks' assistance if necessary. The knowledge of this was calculated to give additional confidence to Hicks. In contemplation of law this is aiding and abetting. Ib., sec. 211a; Thompson v. Com., 1 Metc. (Ky.), 13; S. v. Douglass, 38 La. Ann., 523; 15 Cox Cr. Cases, 51, 52."

In the majority opinion the following are treated as defendant's main exception and assignments of error:

I will take up *seriatim* the position of the majority opinion under the "main exceptions."

I give the entire record of what took place, and not a part, as excepted to.

(1) "At the close of all the evidence defendant moved for judgment of nonsuit, which was denied. The solicitor, as the court was about to take a recess for the night, in open court, and in the presence of the jury, addressed the court and prayed the defendant into custody. The defendant was under a bond of $1,000, which had been ordered given the previous week of the court, and under order of the court the bond was conditioned upon the appearance of the defendant each day during the term and to abide the orders of the court. In the presence of the jury the presiding judge ordered the defendant into the custody of the sheriff. No question was raised by the solicitor as to the sufficiency of the sureties on the bond. The court stated in the hearing of the jury that putting the defendant in custody did not mean at all that the court thought he was guilty. To both the prayer of the solicitor and the order of the court in the presence of the jury the defendant excepted." The statute was against the court giving "an opinion whether a fact is fully or sufficiently proven." Ordering the defendant into custody was no opinion in regard to a fact fully or sufficiently proven.

The other defendant, Hicks, had fled the court. The court below has a sound discretion to make the order. The court said, in the presence and hearing of the jury, that "the putting the defendant in custody did not mean at all that the court thought he was guilty."

There is no doubt about the law that in the court's "sound discretion" it had the right to order the defendant into custody. "While the necessity for exercising this discretion in any given case is not to be determined by the mere inclination of the judge, but by a sound and enlightened judgment, in an effort to attain the end of all law, namely, the doing of even and exact justice, we will yet not supervise it except, perhaps, in extreme circumstances, not at all likely to arise; and it is therefore practically unlimited." *Jarrett v. Trunk Co.,* 142 N. C., 469; *May v. Menzies, ante,* 144; *S. v. Hopper, ante,* 405.

The complaint is that it was made in the presence of the jury. This Court upheld a remark in the presence of the jury, a clear inference of the impeachment of a witness, and no explanation was made by the court to disabuse the minds of the jury. In that case, the Trust Company, 183 N. C., 41, *Stacy, J.,* says: "There is one exception of a different nature, however, which calls for further discussion. We quote from the record: 'During the taking of the testimony, pending argument as to the competency of certain questions and answers and ex-

planations offered by the witness, the court, in the presence and hearing
of the jury, asked the question whether the witness was appearing as
attorney or as a witness, stating that the court was just at this point
unable to see.' To the foregoing remark of the trial judge the defend-
ant excepts, which is defendant's fifteenth exception. Some difficulty
has been experienced in arriving at a satisfactory conclusion as to what
disposition should be made of this exception and assignment of error.
But as it does not appear with certainty that the defendants have been
prejudiced, or disadvantageously circumstanced before the jury, by the
remarks of the judge, we must overrule the motion for a new trial
based upon this portion of the record. 'Appellant must show error;
we will not presume it, but he must make it appear plainly, as the
presumption is against him.' *In re Smith's Will,* 163 N. C., 464. See,
also, Michie Digest, 695, and authorities collected under title 'Burden
of Showing Error.' "

In the instant case, the court told the jury that the putting the de-
fendant in custody did not mean that the court thought he was guilty.
I take it that the court told the jury the truth.

The majority opinion says:

(2) In the course of his Honor's charge to the jury he said: "The
law used to be if a man had connection with a girl under 10, it was a
capital felony, and if between the ages of 10 and 12, it was a felony,
if she had never before had sexual intercourse. The Legislature later
moved the age of consent up to 14 (and a few days ago one House of
the Legislature passed a bill, I believe, moving the age of consent up
to 16 years)."

The full text of the court's charge was as follows:

"It makes no difference whether the girl was willing or not, if she
was between 12 and 14 years of age, and had never before had sexual
intercourse with any person. The law says such a girl cannot consent.
If such girl were under 12 it would be a capital offense. The law
used to be if a man had connection with a girl under 10, it was a
capital felony, and if between the ages of 10 and 12, it was a felony,
if she had never before had sexual intercourse. The Legislature later
moved the age of consent up to 14, and a few days ago one House of
the Legislature passed a bill, I believe, moving the age of consent up
to 16 years."

The charge, when considered as a whole, is very different from only
the part which is excepted to. The Legislature did exactly what the
judge said.

The majority opinion says:

(3) "Again in the charge: 'The defendant introduced certain charac-
ter witnesses, the Rev. Mr. Black, the chief of police, a man named

Floyd, and several others. They all stated his character was good. You will remember who the witnesses were and what they said. In answer to this character evidence, the State contends that neither of these character witnesses said Hart didn't go out with Hicks to have connection with the girl, and did not testify as to what did or did not take place."

If the record is examined carefully, this is stated in the "contentions," not "again in the charge," as stated in the majority opinion. The full portion of the charge is: "Robert J. Hart testified as to meeting Hicks and Gill; that he went with Hicks to Mr. Mangum's home and got Deloris, and that they got in the automobile and went up College Street, and went out beyond the hospital; that Hicks asked him 'Where is the rubber?' that he said, 'If you want to do anything like that I am going to get out.' That he got out and loitered around; that he went back home in the car with them, got out and told Mr. Mangum he was a gentleman; that he thought Hicks wanted him to go with him to Mr. Mangum's house to introduce the girl to him; that Hicks did not give any other reason for asking him to go. The defendant introduced certain character witnesses, the Rev. Mr. Black, the chief of police, a man named Floyd, and several others. They all stated his character was good. You will remember who the witnesses were and what they said. In answer to this character evidence, the State contends that neither of these character witnesses said Hart didn't go out with Hicks to have connection with the girl, and did not testify as to what did or did not take place."

The judge's erroneous statement of a contention of a party must be called to his attention at the time. It cannot be taken advantage of by an exception to the charge after verdict. *S. v. Tyson,* 133 N. C., 692; *S. v. Davis,* 134 N. C., 633; *S. v. Lance,* 149 N. C., 555; *S. v. Kincaid,* 183 N. C., 710; *S. v. Baldwin,* 184 N. C., 789. In this case it was not erroneous.

The majority opinion says:

(4) "Still again in the charge: 'Every case of this nature, if the defendant's guilt be established, which results in an acquittal, tends to injure society.'"

The record on this is as follows: "The defendant contends that he never attempted to have connection with the girl, and that he did not know Hicks' intention; that he has fully explained the matter, has shown his character to be good, and that the jury should acquit him. In reply to that the State contends that if it had not been upon a concerted plan to get her out there and for one or the other to have intercourse with her that Hart could and would have prevented it. The State contends that by getting her out he aided Hicks, and if he had

not aided Hicks he would have told· Mr. Mangum upon his return. Among other statements by the judge, he remarked: 'Every case of this nature, if the defendant's guilt is proven, which results in an acquittal, tends to injure society.' "

This was said in reference to the State's contention (there is no error unless called to the attention of the court.    Cases *supra*).

(5) And again in the charge: "I am not appearing for either side; I am not interested in Mr. Hart's acquittal, and I am not especially interested in his conviction, but I am interested in seeing that both the State and the prisoner have a perfectly fair trial."

The record on this is as follows: "At this point counsel for the defendant asked the court, in stating the contentions of the defendant, to call attention to Hart's evidence that when the automobile turned down College Street instead of toward the drug store that he, Hart, asked them to go to the drug store; with which request the court complied.   The court then stated that both the State and the prisoner were entitled to an absolutely fair and impartial trial, and added, I am not appearing for either side.   I am not interested in Mr. Hart's acquittal, and I am not especially interested in his conviction, but I am interested in seeing that both the State and the prisoner have a perfectly fair trial."

The majority opinion says:

(6) "The defendant also excepted because in the charge his Honor repeatedly called the attention of the jury to the contentions of the State, while but slight reference was made to the contentions of the defendant."    The entire charge shows he gave the contentions of both sides.

The majority opinion says:

(7) "Finally, the defendant excepted for that his Honor failed to instruct the jury as to the law relating to aiding and abetting, but simply charged the jury that the defendant. Hart would be guilty if he aided or abetted Hicks, without any explanation or instruction as to what constituted aiding and abetting."

Webster defines *aider* "one who, or that which, aids"; and defines *aids* "help, support, succor, assistance, relief"; *abettor* "one who abets, an instigator of an offense or an offender"; *abet* "to instigate or encourage by aid or countenance."   The simple words, aiding and abetting, and what constitutes the explanation, are the words themselves. The contentions given by the court showed what was aiding and abetting, without actually defining so common and well-known words.   The law was given in the contentions.

The majority opinion does not single out one particular error made in the court's charge.   It is a broadside attack to the court's conduct below in the trial of this cause.

*Judge Ruffin,* in *S. v. Angel,* 29 N. C., 27, said: "His Honor, undoubtedly, did not transcend his powers and duty, under the act of 1796, in delivering his charge to the jury. The 'facts,' on which the act restrains him from expressing an opinion to the jury, are those, respecting which the parties take issue or dispute, and on which, as having occurred or not occurred, the imputed liability of the defendant depends. But the act does not prohibit the judge from drawing attention to things that occur in court and speaking of them as having actually occurred there." In that case the charge was affirmed in what was excepted to. "In the course of the charge to the jury, the presiding judge remarked 'that the witnesses differed in their accounts of the transaction,' and then recapitulated their testimony as to the manner in which the reëncounter took place; and after some instructions upon matters of law he remarked further that, 'according to the testimony of the prisoner's witnesses, the mortal blow *was given* at or about the commencement of the reëncounter.' The judge informed the jury that they were the judges of the truth and weight of the testimony of the witnesses."

*Chief Justice Smith,* in *S. v. Robertson,* 86 N. C., 628, said: "Another witness had testified to the disorderly character of the house, and to his having come to the solicitor at the instance of another to report a case of retailing liquor without license, against the defendant, and had then mentioned the disorderly conduct of the defendant, and was cross-examined at great length upon those matters, in order to prove his ill-will and prejudice towards the accused, when his Honor remarked that the counsel had carried the examination in that direction far enough, and that it was the duty of a good citizen to report crime when inquired of by the solicitor. The exception is to the latter part of the remark, as violating the act of 1796. We think the expression used was pertinent and proper, and correct in itself. It certainly becomes a law-abiding citizen to convey, not to withhold, any information he may possess, when interrogated by the prosecuting officer of the State, and the act is not to his discredit."

The same *Chief Justice* said, in *S. v. Brown,* 100 N. C., 524: "The exception to the inquiry of the judge, addressed to counsel of defendant, if it would be fair to permit a declaration of an absent person, imputing criminality to the prosecutrix, to be given in, and refuse to hear his subsequent denial of the truth of the charge, was but an expression of a wish and purpose to have a fair trial, the natural impulse of an impartial and just judge conducting the trial. It is argued here as an indication of an opinion upon the merits of the controversy forbidden by the act of 1796, The Code, sec. 413. It does not appear to us susceptible of any such interpretation, and, at most, as but an inti-

mation to counsel that such a course, if pursued, would not be sustained in the ruling upon the matter."

In *S. v. Jacobs*, 106 N. C., 695, the following was held: "A remark of the judge made before trial begun, that the jailer had informed him the prisoner 'would escape if he had the opportunity,' is not an expression of opinion upon the facts prohibited by the act of 1796." *Clark, J.*, in that case said: "It is difficult to see how the remark of the judge violated any provision of this statute. No juror had been selected, the remark was not in the presence of the jury, nor did it contain any opinion that 'a fact was fully or sufficiently proven.' No facts had been shown in evidence. Indeed, had the jury been impaneled, the statute prohibited the judge 'from expressing an opinion only upon those "facts" respecting which the parties take issue or dispute, and on which, as having occurred or not occurred, the imputed liability of the defendant depends.' "

In *S. v. Crane*, 110 N. C., at p. 535, it is said: "If juries should be deemed incompetent to comprehend, or unable to obey, so plain a direction as that a paper read in their hearing is 'not to be considered as evidence, and that it had only been admitted to make the defendant's reply to it (when read to him) intelligible'—if so low an estimate should be placed upon juries, then the jury system is a failure, and should have no place in our jurisprudence. If unable to comprehend this, why so often contention whether instructions, frequently far more abstruse, should be given to the jury. But such a view is an unjust one; the jury is an essential part of the judicial system among every English-speaking people, and while not perfect, the experience of ages and the observation of the present are that it performs fairly well its part. Certainly no better substitute has ever been found. To underrate the intelligence of twelve honest impartial men who try the questions of fact submitted to them is a mistake. When aided by a just and intelligent judge, their verdicts are generally correct. Jurors are not expected to possess legal training. Their province is not to pass on questions of law. But their grasp of the facts is usually just and accurate, and probably not a court passes that upon the jury there are not men of equal mental capacity with the judge who presides, or the counsel who addresses them. Jurors are not in their nonage, and it is not just to underrate their intelligence."

In *S. v. Baldwin*, 178 N. C., 687, upon the following facts, the remarks of the judge was found to be not improper: "Where a large quantity of spirituous liquor was found in the possession of two persons, separately indicted under the statute making such possession evidence that it was for the unlawful purpose of sale, a remark of the judge in sentencing one of them, upon his conviction, that he thought

both persons accused had been selling and delivering the liquor at a certain town, is not in the contemplation or meaning of Rev., 535, prohibiting the judge from giving an opinion whether a fact is fully or sufficiently proven on the trial of the other defendant." See cases cited. See, also, *S. v. Laxton,* 78 N. C., 564; *S. v. Robertson,* 121 N. C., 551; *S. v. Dewey,* 139 N. C., 560; *McDonald v. McArthur,* 154 N. C., 11; *S. v. Rogers,* 168 N. C., 116; *Long v. Byrd,* 169 N. C., 659; 16 C. J., secs. 2311 *et seq.*

The cases cited in the majority opinion are not applicable to the court's conduct of this cause. If they were applicable, I would take it that what the court said was the truth, which would cure any intimation on the facts, if there was any, and the court was honest when it told the jury "I am not appearing for either side. I am not interested in Mr. Hart's acquittal, and I am not especially interested in his conviction, but I am interested in seeing that *both the State and the prisoner have a perfectly fair trial."*

In commencing the charge to the jury, the able, conscientious judge who tried this case (I want to commend it) said:

"Gentlemen of the jury, men are never called upon to perform a more sacred duty than that of serving upon juries. In this day of unrest and criticism of the courts and of government agencies generally, it behooves you and me and all who participate in the conduct of our courts to conduct ourselves upon such a high plane that no one may find room to criticize us or our government. *It is absolutely essential that every man who is being tried and every man who is being sued shall have an absolutely fair and impartial trial.* Any other sort of trial is a farce and a fraud. It is your duty to hear the evidence and the instructions of the court in this case, or any other case in which you may be called upon to serve as a juror, and then march up like men and under your oath render your verdict according to the evidence, guided by instructions of the court, regardless of public sentiment or your own personal inclinations or wishes. When jurors try cases upon such a high plane there is no room left for the anarchist to criticize our government and our courts. I am not going to require that you be kept together during the progress of this trial because in my long experience on the bench I have observed that jurors are mindful of the oath they have taken, and I have never yet had one wilfully commit a wrong. They sometimes make mistakes, as I do, but I have never known a jury to wilfully violate its oath. Let me repeat: be careful that you discuss this case with no one and that you permit no one to discuss it in your presence or hearing. If any one attempts to discuss the case with you, tell him that you are on the jury, and if then he insists upon discussing it, you report the fact to me."

In almost the final words of the charge he told the jury, "I am interested in seeing that both the State and the prisoner have a perfectly fair trial." I take it that the twelve jurors of Granville County who tried this case were selected according to law. The board of county commissioners did what the law said they should do. "The board of county commissioners . . . shall cause their clerks to lay before them the tax returns of the preceding year for their county, from which they shall proceed to select the names of all such persons as have paid all the taxes assessed against them for the preceding year and are of good moral character and of sufficient intelligence." C. S., 2312. That they were men of *"good moral character and sufficient intelligence."* That they could understand what a court said, that both the State and prisoner should have a *perfectly fair trial.* The trial should be *perfectly* fair. Can there be any misunderstanding what that meant? The language is clear and explicit, more than a "perfect" fair trial but perfectly. What is Webster's definition of "perfect"? "Without flaw, fault, blemish; without error, mature, whole, pure, sound, right, correct."

The last thing the court told the jury was this: "The court stated to the jury that *they were the sole judges of the facts, that the judge did not intend by anything said by him to intimate that the court had any opinion as to whether the prisoner was guilty or not guilty,* that it was for them to say how they found the facts to be from the evidence in the case under instructions given as to the burden of proof."

It has been often said by this Court, but I repeat it again: "Verdicts and judgments are not to be set aside for harmless error, or for mere error and no more. To accomplish this result, it must be made to appear not only that the ruling complained of is erroneous, but also that it is material and prejudicial, amounting to a denial of some substantial right." *In re Ross,* 182 N. C., 477; *Burris v. Litaker,* 181 N. C., 376; *Wilson v. Lumber Co., ante,* 56.

This is my first written dissent. I feel impelled by the facts as appear in the record to do so. I do so with all respect for those who disagree with me.

> "To thine own self be true;
> And it must follow, as the night the day,
> Thou can'st not then be false to any man."

I believe that the courts are made to administer law; no man, or set of men, have any right to take the law in their own hands.

This commonwealth has seen fit to make a law to restrain the vileness of men and protect girlhood. This young man has been tried by an upright judge and a jury of "good moral character and sufficient

intelligence," and convicted. He has been defended by able and brilliant counsel. He has been, in my opinion, fairly tried and convicted. I can see no prejudicial or reversible error. I commend most heartily the conduct of those concerned in this case in the orderly procedure—appealing to law. It is the only safe course. The courts are for the redress of wrongs—there is nowhere else in a land of law.

CLARK, C. J., concurring in the dissenting opinion of *Clarkson, J.*: The facts and the law in this case are so clearly and fully stated in the opinion of *Judge Clarkson* that they need not be repeated.

On defendant Hart's statement alone, discarding all others, he was clearly guilty of aiding and abetting in the kidnapping and ravishing of a girl 13 years of age. On his own statement, with the reasonable inference to be drawn therefrom, the other defendant, Hicks (who has fled the State), came to him and suggested the conspiracy by which Hicks was to furnish the automobile and he was to go to call on this girl, whom Hicks did not know, at her home and take her to the drug store to get ice cream or soda water. They went about dusk, and the defendant Hart, who knew the girl, went into the house and overcame her mother's reluctance by promising to bring her back in a few minutes. When the girl went out to the automobile she found Hicks also, a man of 23 or 24 years of age. The defendant Hart himself was 17 or 18. Instead of taking her to the drug store the automobile quickly turned off and she was taken off into the night into the woods or a deserted place two miles from town and there, in consequence of a remark which Hart says Hicks made to him, he got out of the car, he says, "knowing what Hicks intended to do," and walked off a few steps. He made no attempt to prevent it by persuasion or otherwise, and the deed was done. The girl of 13 could not consent even if, in the darkness of a sleety night, two miles off in a desolate place, and dominated by the two lustful men, she had dared make a hopeless cry for help, which no one could have heard. Hart soon returned to the automobile, and the girl says that he himself then proposed to ravish her but she repulsed him, having found out what it meant and doubtless suffering from pain, as the doctor says on examination he found the parts had been recently lacerated.

The doctor also testified that she had never previously had any intercourse with a man, and there was uncontradicted testimony that she was a respectable girl of good character and that her family stood well in the community. The girl's testimony of the whole brutal deed is clear and convincing in all its pathetic details.

The act of carrying her off was necessarily kidnapping, because it was accomplished by the lying statements of Hart to the girl's mother

that they were going to the drug store and that he would bring her back in a few minutes. Instead of that she was taken off in the cold and sleet two miles away, where her screams and appeals for help could have been heard by no mortal ears except the two men who had brought her there, in all the ignorance of her 13 years, to commit this foul wrong upon her.

Hart on his return made no statement of the crime that had been perpetrated, no denunciation of Hicks' deed; and his conduct from beginning to end shows not only a previous conspiracy but the acquiescence in it, both at the time and afterwards, until, upon the statement of the girl which, on her return home, she immediately made to her mother, legal proceedings were promptly taken out. Hicks at once fled the State.

In the long annals of this Court there is no case that is more atrocious in all its features. Two men conspire to take an innocent girl—for such the uncontradicted evidence shows she was—13 years of age from her home upon the lying representations of this defendant, to be ravished, C. S., 4209, by the older man and attempted by the younger, for a girl of that age could not give consent. It was really a case of rape, which in this State is properly a hanging offense.

As *Mr. Justice Clarkson* justly says, there is not a single error of law on the part of the judge pointed out or even alleged in the trial—neither in the omission nor admission of evidence nor in the charge. The appeal has been treated by defendant's counsel rather as an impeachment trial of the judge to divert attention from the two criminals charged by a grand jury, one of whom has confessed his guilt by flight and the other has been convicted by a jury. Even if there had been any errors alleged or shown they would have been harmless, because, on the defendant's own testimony, he was guilty to the deepest degree. He admits the previous agreement between himself and Hicks, the older man; he made no protest to the car going to this remote place instead of to the drug store, as he had promised the mother; he says that when he got out of the car he "knew what Hicks intended to do and made no opposition," and he made no subsequent admission until forced into court himself. He was an aider and abettor both before and after the fact, upon his own testimony.

The matter most strenuously charged as error of the judge, to give color to the claim that the defendant might have been acquitted, was that at the close of the evidence the solicitor moved that the defendant, who was under bond, should be taken into custody, and the motion was granted. That was a matter which rested solely in the discretion of the trial judge. He was a lawyer of distinction, a man of judgment and ability, who had been placed in that position by the votes of the

people, and it was not necessary that his action should be submitted to a vote of the bystanders or the approval of the defendant's counsel. At the end of the testimony, as the court was about to adjourn for the night, it being apparent that a conclusive case of guilt as to the defendant had been shown, and it being also known that his partner in guilt, Hicks, had fled the State, there was such ground for doubt that the defendant that night might follow the same course by passing over the State border, less than a half-hour's distance in an automobile, the judge of his own motion should have placed him in custody. Most certainly, when the solicitor moved for his being taken into custody, if the judge had refused and the defendant had escaped that night, the judge would have been the subject of just censure by all good citizens.

There are two or three allegations that the judge expressed an opinion upon the facts, but an examination of the record will show that he was stating the contentions of the State, as he also stated the contentions of the defendant, fairly and fully, and the same is sufficient answer to the charge that the judge stated the contentions of the State more fully than those of the defendant. The charge as set out by *Judge Clarkson* in his opinion is fair and full and an admirable and impartial statement of the law.

It is also charged as error on the part of the judge, which ought to set aside the verdict, notwithstanding the facts admitted by the defendant upon the trial, that the judge stated, in reciting the progress of the law, which originally did not make this offense a felony at common law, if the female child was beyond 12 years, that our statute had raised to 14, the age at which a seducer could ravish her with impunity, and that the Legislature then sitting had passed a bill in one House raising the age of consent to 16. In fact, the Legislature at that very time, at the instance of the women of the State, had passed such bill in one House, which has become chapter 140, Laws 1923, ratified 3 March, and the judge stated the law correctly, and it could have had no influence on the jury in this case, who understood the fact that the girl who had been thus kidnapped and ravished, C. S., 4209, was under 14 as charged in the bill.

An appeal also has been made that if this defendant undergoes the punishment which the law denounces for this nefarious crime, and for which the judge has not imposed the full penalty of the law, it would be to ruin him; but to acquit a man guilty of a crime against a 13-year-old girl, of which he is guilty on his own testimony, is injurious to society and to the State, and the jury were not improperly told by the judge that they should do their duty with impartiality. Even then, when he put the defendant in custody upon motion of the solicitor, the judge was careful to tell the jury, though it was not required

STATE *v.* HART.

of him to do so, that this act was no expression of opinion on his part as to the guilt or innocence of the prisoner. A Granville County jury of 12 honest, intelligent men upon this testimony could not possibly have acquitted the defendant upon his own showing, and it is a serious reflection upon the intelligence of jurors to allege that such act of the judge biased their verdict. The remarks of the judge were not error. It was the defendant who had committed a crime for which he stood charged by the grand jury and of which the unanimous verdict of the jury has convicted him.

The American Bar Association, headed by *Chief Justice Taft,* has recently addressed to the American people a statement that there was a "growing want of respect, not to say a growing hostility, to the courts," and among a free and intelligent people, such as those in North Carolina and in this Union, this cannot occur when the courts are doing their full duty. If it is not a punishable offense for these two men, one 24 and the other 17 or 18 years of age, to conspire to kidnap the respectable 13-year-old daughter of a respectable citizen and one ravish her and the other aid and abet in the act, even if he did not attempt to also perpetrate it (as the girl testifies that he did), what citizen of North Carolina, what mother or brother can feel sure that the honor of his little child will be protected by the courts?

Such men as these two defendants should be made to know that the law is prompt and certain in infliction of punishment when guilt is clear as here. Criminals should be made to feel that justice can grasp with a hand of iron and wring with an arm of steel. When this is done, secret societies to enforce the law will disappear and the courts will not, as *Chief Justice Taft* says, be the subject of increasing disrespect and of growing hostility. As *Lord Chancellor Erskine* said on a memorable occasion in English history, "Morality comes in the cold abstract from the pulpit, but men smart practically under its lessons when we lawyers are the teachers."

On his own showing the defendant was guilty of one of the most dastardly crimes that appears on the records of this Court. Upon the verdict of 12 good and true men, against whom the defendant made no objection, he was found guilty. On a trial, in which there appears not a single legal exception to the evidence or to the charge of the court, he has been found guilty. The judge did nothing but his duty. He charged the evidence and the law fairly and impartially, and there is no ground on which this defendant should be excused from the penalty of the law which he has brought down upon his own head.